TAYLOR v KENT RADIOLOGY, PC

Docket No. 286078. Submitted September 9, 2009, at Grand Rapids. Decided December 22, 2009, at 9:05 a.m.

Richard and Karen Taylor brought a medical malpractice action in the Kent Circuit Court against Kent Radiology, P.C., Louis Bixler, M.D., and Trinity Health-Michigan, alleging that Bixler had breached the standard of care applicable to a radiologist by failing to diagnose a fracture that Richard Taylor sustained in a fall and that the other defendants were vicariously liable for the malpractice. Plaintiffs subsequently stipulated the dismissal of Trinity. The jury returned a verdict in plaintiffs' favor, awarding Richard Taylor past and future economic damages, but did not award Karen Taylor damages. After the court, Dennis C. Kolenda, J., entered a judgment, plaintiffs moved for additur, and defendants moved for remittitur, judgment notwithstanding the verdict, or a new trial. Mark Trusock, J., who replaced retired Judge Kolenda, heard the motions and denied them. Defendants appealed, and plaintiffs cross-appealed.

The Court of Appeals held:

1. Plaintiffs alleged a traditional medical malpractice claim, rather than a claim for a lost opportunity to achieve a better result, and did not amend or seek to amend their complaint to include a lost-opportunity claim. Thus, the second sentence of MCL 600.2912a(2), which requires a plaintiff seeking recovery for the loss of an opportunity to survive or achieve a better result to prove that "the opportunity was greater than 50%," did not apply in this action, and plaintiffs were not required to present evidence about the degree by which Bixler's malpractice affected Richard Taylor's opportunity for a better outcome. Plaintiffs only had to prove by a preponderance of the evidence that Bixler's failure to diagnose the fracture injured Taylor. Plaintiffs presented evidence that Taylor's fracture worsened between Bixler's examination and the time it was properly diagnosed. The aggravation of the fracture made reconstructive surgery harder to perform and necessitated a second surgery. There was also evidence that the delayed treatment accelerated the rate of development and severity of Taylor's arthritis. The trial court did not err by denying defendants'

motions for a directed verdict and judgment notwithstanding the verdict. Nor did the trial court err when it refused to instruct the jury on the burden of proof applicable to lost-opportunity claims.

2. The trial court did not err by directing a verdict in plaintiffs' favor on the issue of comparative negligence. Plaintiffs did not sue to recover damages for the original foot injury; rather, they sought damages for the aggravation of that injury. The statutes imposing comparative fault only require the allocation of liability in proportion to the fault for the injury for which the plaintiff is seeking damages. In this case, plaintiffs could only be allocated liability to the extent that they were at fault for the aggravation of the original foot injury, but there was no evidence that Taylor bore any fault for the aggravation. Even assuming that the jury should have been permitted to consider Taylor's possible fault for the original injury, there was no evidence showing that he was at fault and the doctrine of res ipsa loquitor did not establish an inference of negligence.

3. The trial court did not err by characterizing the costs to hire persons to perform household tasks that Richard Taylor would otherwise have performed as economic losses or permitting plaintiffs to characterize them as such and did not abuse its discretion by allowing plaintiffs' expert witness to testify about the future costs to replace services.

4. The trial court did not err by denying defendants' motion for a new trial or remittitur. Defendants argued that the award of damages was excessive. A court should exercise the power of remittitur with great restraint, examining the evidence in the light most favorable to the nonmoving party to determine whether the evidence supported the jury's award. If the award falls reasonably within the range supported by the evidence and within the limits of what reasonable minds would consider just compensation, the court should not disturb it. Moreover, the jury's decision to not award past economic damages for lost income did not preclude an award for future lost income. The amount of future economic damages the jury awarded fell reasonably within the range supported by the evidence.

5. The trial court did not abuse its discretion when it refused to request that Judge Kolenda be recalled to hear plaintiffs' motion for additur. There was no indication that Judge Trusock was incapable of deciding the motion on the merits and according to law and no evidence that the request would have been granted or that Judge Kolenda would have been available.

6. The trial court did not abuse its discretion by denying plaintiffs' motion for additur or a new trial. Plaintiffs argued that

the award of damages was inadequate. MCR 2.611(A)(1)(d) and (e) permit a court to grant a new trial when the verdict is clearly or grossly inadequate or excessive or against the great weight of the evidence. Alternatively, if the only error in the trial was the inadequacy or excessiveness of the verdict, MCR 2.611(E)(1) permits the court to deny the motion for a new trial on the condition that the nonmoving party consent to the entry of a judgment in the amount that the court finds to be the lowest (if the verdict was inadequate) or highest (if the verdict was excessive) amount the evidence will support. Whether the verdict is clearly or grossly inadequate or excessive or against the great weight of the evidence depends on the nature of the evidence adduced at trial. The plaintiff must prove each element of his or her case, and damages such as those for medical expenses are distinct from damages for such things as pain and suffering. The jury is free to credit or discredit any evidence, and the jury is not required to award one item of damages merely because it awarded another item. Plaintiffs argued that the decision to not award noneconomic damages was inconsistent with the jury's award of economic damages and against the great weight of the evidence of noneconomic damages presented. Plaintiffs, however, presented little testimony concerning noneconomic damages.

Affirmed.

K. F. KELLY, J., concurred in the result only.

1. NEGLIGENCE — MEDICAL MALPRACTICE — LOSS OF OPPORTUNITY TO SURVIVE OR ACHIEVE A BETTER RESULT.

The second sentence of MCL 600.2912a(2), which requires a plaintiff seeking recovery for the loss of an opportunity to survive or achieve a better result to prove that "the opportunity was greater than 50%," does not apply to traditional claims of medical malpractice that allege that a physician's breach of the standard of care proximately caused a specific, concrete injury.

2. NEGLIGENCE — MEDICAL MALPRACTICE — DAMAGES — ECONOMIC LOSSES — REPLACEMENT SERVICES.

Costs incurred to replace services, including substitute services for domestic or household tasks, that the injured person would have performed are economic losses recoverable in a medical malpractice action (MCL 600.1483[2], 600.2945[c], 600.6305[1]).

3. JUDGMENTS — VERDICTS — INADEQUATE VERDICTS — NEW TRIAL — ADDITUR.

A trial court may grant a new trial when the verdict is clearly or grossly inadequate or excessive or is against the great weight of the

evidence; alternatively, if the only error in the trial was the inadequacy or excessiveness of the verdict, the court may deny the motion for a new trial on the condition that the nonmoving party consent to the entry of a judgment in the amount that the court finds to be the lowest (if the verdict was inadequate) or the highest (if the verdict was excessive) amount the evidence will support; whether the jury's verdict is clearly or grossly inadequate or excessive or against the great weight of the evidence depends on the nature of the evidence adduced at trial, and the court will defer to the jury's judgment on the weight accorded the evidence concerning damages (MCR 2.611[A][1][d] and [e], 2.611[E][1]).

*Gruel Mills Nims & Pylman LLP* (by *Scott R. Melton* and *William F. Mills*) for Richard and Karen Taylor.

*Berry, Johnston, Sztykiel, Hunt & McCandless, P.C.* (by *Steven C. Berry* and *Christopher S. Berry*), for Kent Radiology, P.C., and Louis Bixler, M.D.

Before: M. J. KELLY, P.J., and K. F. KELLY and SHAPIRO, JJ.

PER CURIAM. In this medical malpractice case, defendants Kent Radiology, P.C., and Louis Bixler, M.D., appeal as of right a verdict in favor of plaintiffs, Richard and Karen Taylor.[1] On appeal, defendants argue that the trial court erred when it denied their motions for a directed verdict and judgment notwithstanding the verdict, erred when it refused to instruct the jury on the burden of proof in medical malpractice cases involving a lost opportunity to survive or achieve a better outcome, erred when it directed a verdict in plaintiffs' favor as to defendants' defense of comparative negligence, erred with regard to the evidence concerning plaintiffs' economic losses, and erred when it denied defendants'

---

[1] Because Karen Taylor's claims are derivative in nature, we shall use "Taylor" to refer solely to plaintiff Richard Taylor and, when necessary, shall refer to plaintiff Karen Taylor by her full name.

motion for a new trial or remittitur. On cross-appeal, plaintiffs argue that the trial court erred when it refused to ask for the recall of the judge who presided over the trial to hear plaintiffs' postjudgment motion for a new trial or additur and erred when it denied that same motion. Because we conclude that there were no errors warranting relief, we affirm.

### I. BASIC FACTS AND PROCEDURAL HISTORY

#### A. TAYLOR'S INJURY AND TREATMENT

Taylor testified that he owns and operates Richard Taylor Mobile Home Services. His business involves setting up and finishing mobile and modular homes. He explained that the work is hands-on and that he performed much of the work himself. Taylor stated that he is no longer able to perform the work because he injured his foot.

Taylor fell and injured his foot while performing finishing work on a home. At the time, he was working on a ladder just under the eaves of a single-story home. He indicated that he was about four or five feet off the ground when the ladder, which was placed on beach sand, started to slide after the sand gave way. Taylor said that his leg got caught in the ladder as the ladder spun and fell. Another builder at the worksite took Taylor home after the fall. Taylor said that when he got home he iced his foot, which was "sorer than the dickens."

Taylor did not remember the exact date of the injury and admitted that he told a staff person at one physician's office that the injury occurred sometime after Thanksgiving 2003. However, he testified that he stayed off his foot after the injury and went to see his family physician, Dr. Richard Crissman, within one or

two days. Crissman testified that he saw Taylor for his foot injury on December 4, 2003. In his notes, Crissman wrote that Taylor had "fallen through and off of a ladder" on the day before the office visit. Crissman testified that he physically examined Taylor's foot and did not "feel that there was a fracture there." Crissman diagnosed Taylor with a sprained "foot/ankle" and treated him by applying a supportive dressing called a gelocast.

On December 8, 2003, Taylor went back to see Crissman with continued complaints of pain in his foot. After this visit, Crissman sent Taylor to St. Mary's Hospital[2] for an x-ray of his foot. On that day, Dr. Louis Bixler was the radiologist assigned to examine the emergency films and plain films at St. Mary's hospital.

Bixler testified that on a typical day he would examine a minimum of 150 studies. Bixler had no specific memory of viewing the films that were part of the foot study done for Taylor's right foot. However, he acknowledged that he prepared a report for the study, which contained three views: AP, lateral, and oblique.[3] Bixler testified that the study included two lateral views—one that was light and one that was dark. Bixler stated that he typically prefers the darker views because you can see bone detail better. In his report, Bixler noted that he saw "no evidence of fracture" in the AP and oblique views. Bixler testified that he must have reviewed all the views, including the lateral views, because he would not have reviewed an incomplete study. For that reason, he concluded that the missing reference to the lateral

---

[2] Defendant Trinity Health-Michigan does business as St. Mary's Mercy Medical Center in Grand Rapids, Michigan.

[3] An AP, or anterior-posterior, view is an overview of the foot with a focus on the toes. The lateral view is a side view, and the oblique view is of the foot slightly rotated.

views in his report must have been a typographical error. Bixler's report also included a recommendation for a bone scan of the tarsometatarsal joints if the symptoms persisted.

Crissman testified that he received Bixler's report on the same day that the x-rays were taken, but did not see Taylor until December 9, 2003. Taylor said that Crissman told him the results of the x-rays: that there was no break and that it was only a sprain. Crissman again wrapped Taylor's foot in a gelocast. Taylor testified that Crissman told him to elevate his foot and let "pain be your guide" with regard to activities. Taylor said he wrapped his foot tight each day and returned to work. He even began to duct-tape his boot in order to stabilize his foot and make it possible to "hobble on it."

Crissman saw Taylor for continued reports of foot pain from December 2003 through March 2004. Finally, after an appointment on March 12, 2004, Crissman suggested that Taylor see an orthopedic surgeon, Dr. Kevin Kane, with River Valley Orthopedics.

Taylor went to River Valley Orthopedics and had new x-rays taken. A staff person at the office then approached Taylor and informed him that he had a broken ankle. Taylor testified that he got a little "testy" at this point and asked, " 'What do you mean it's broke?' " Taylor explained that he had been working on "this thing." The staff person also told him that Kane had looked at the film and would rather pass it on to Dr. Patricia Kolodziej because she was more experienced with ankle surgeries.

Taylor first saw Kolodziej on April 8, 2004. Kolodziej informed Taylor that he had a broken talus. Kolodziej recommended surgery to try and reconstruct the talus and "put the pieces back in as normal a position as possible and try and get it to heal." She also told Taylor

that a broken talus was a very serious injury and that he "would not have a normal foot regardless of [the] timing of the surgery."

One of Taylor's expert orthopedic surgeons, Dr. James Gilbert, testified that the key to a successful treatment of a talus fracture is the accurate restoration of the joint surfaces. Gilbert noted that the talus bears more weight than any other bone in the body and, for that reason, there is an advantage to treating a talus fracture as early as possible. This is because "delayed treatment allows further collapse of the fracture fragments and further displacement. And it is much, much easier to reposition the fragments back to their anatomical position if the fracture is treated fresh rather than delayed." Gilbert stated that the film of Taylor's talus showed evidence that the talus had begun to collapse and evidence of avascular necrosis—bone death caused by loss of blood flow.

Kolodziej tried to surgically repair Taylor's talus on April 23, 2004. However, after the surgery Kolodziej had x-rays taken, and those x-rays revealed that one of the fragments had displaced. For that reason, the surgery had to be redone. During the second surgery, Kolodziej felt that she had to place a screw into the joint in order to secure the fragment. Although Kolodziej testified that Taylor's recovery was better than that of the average person with this injury, she admitted that the first surgery was harder as a result of the delayed diagnosis and agreed that the second surgery would not have been necessary were it not for the delayed diagnosis. Kolodziej monitored Taylor over the next few months and noted that the repair appeared to hold, but that the area of the talus that broke off showed signs of avascular necrosis and that the subtalar joint showed signs of arthritis within that time.

### B. THE PRESENT LITIGATION

In May 2006, plaintiffs sued defendants. Taylor sued Bixler for breaching the standard of care applicable to a radiologist by failing to diagnose the talus fracture on December 8, 2003. Taylor sued Kent Radiology and Trinity Health-Michigan under the theory that they were vicariously liable for Bixler's malpractice. However, plaintiffs eventually stipulated to the dismissal of Trinity Health-Michigan.

In June 2006, defendants answered plaintiffs' complaint. In their answer, defendants asserted as a defense that Taylor's claims were barred because he sustained the original injury as a result of his failure to use ordinary care while working. The case eventually proceeded to trial before Judge Dennis Kolenda in February 2008.

The jury returned a verdict in favor of plaintiffs on February 26, 2008. The jury found that Bixler had breached the standard of care and that the breach caused Taylor to suffer injuries. The jury awarded Taylor $10,775.18 in past economic damages, which was the total cost of Taylor's second surgery. The jury also awarded Taylor $262,900 in future economic damages. The jury did not award Taylor any noneconomic damages and did not award Karen Taylor any damages—economic or noneconomic.

On March 17, 2008, the trial court entered a judgment in favor of plaintiffs for $273,675.18. On March 28, 2008, plaintiffs moved for additur, and on April 4, 2008, defendants moved for judgment notwithstanding the verdict, remittitur, or a new trial. Judge Mark Trusock, who had replaced Judge Kolenda after Judge Kolenda retired, heard these motions. On June 9, 2008, Judge Trusock denied the parties' motions.

This appeal followed.

## II. LOST OPPORTUNITY FOR A BETTER OUTCOME

### A. STANDARDS OF REVIEW

We shall first address defendants' arguments that the trial court erred when it denied defendants' motion for a directed verdict, denied their motion for judgment notwithstanding the verdict (JNOV), and improperly instructed the jury. Specifically, defendants contend that plaintiffs failed to sustain their burden of proof under the second sentence of MCL 600.2912a(2), which involves the burden of proof for claims premised on a lost opportunity to survive or achieve a better outcome, and, for that reason, the trial court should have granted their motions for a directed verdict and JNOV. Defendants also contend that the trial court erred when it refused to instruct the jury on the proper burden of proof under MCL 600.2912a(2).

This Court reviews de novo a trial court's decision with regard to both a motion for a directed verdict and a motion for JNOV. *Sniecinski v Blue Cross & Blue Shield of Michigan*, 469 Mich 124, 131; 666 NW2d 186 (2003). Motions for a directed verdict or JNOV are essentially challenges to the sufficiency of the evidence in support of a jury verdict in a civil case. See *Napier v Jacobs*, 429 Mich 222, 229-230; 414 NW2d 862 (1987). This Court reviews challenges to the sufficiency of the evidence in the same way for both motions: we "review the evidence and all legitimate inferences in the light most favorable to the nonmoving party." *Wilkinson v Lee*, 463 Mich 388, 391; 617 NW2d 305 (2000). "Only if the evidence so viewed fails to establish a claim as a matter of law, should the motion be granted." *Id.*, citing *Orzel v Scott Drug Co*, 449 Mich 550, 558; 537 NW2d

208 (1995). If reasonable persons, after reviewing the evidence in the light most favorable to the nonmoving party, could honestly reach different conclusions about whether the nonmoving party established his or her claim, then the question is for the jury. *Sparks v Luplow*, 372 Mich 198, 202; 125 NW2d 304 (1963).

This Court also reviews de novo claims of instructional error. *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000). "In doing so, we examine the jury instructions as a whole to determine whether there is error requiring reversal." *Id.*

### B. PROCEDURAL BACKGROUND: DEFENDANTS' MOTIONS FOR DIRECTED VERDICT AND JNOV

On the sixth day of trial, defendants moved for a directed verdict. Defendants argued that under MCL 600.2912a(2) plaintiffs had to prove "that more likely than not Dr. Bixler's failure to detect evidence of the fracture in December of 2003, caused Mr. Taylor to lose an opportunity to achieve a better result that was greater than 50 percent." Defendants concluded that this burden required plaintiffs to prove both that the lost opportunity was greater than 50 percent and to prove what that better outcome would have been. Defendants argued that this case was not an "aggravation case" because MCL 600.2912a(2) specifically applies to all medical malpractice cases.

In response, plaintiffs flatly rejected that this was a lost opportunity case: "We're no longer talking about a lost opportunity for a better result, we're talking about an admitted injury, even if we accept, pure and simple, the testimony of their own experts." For this reason, plaintiffs further argued, the statute governing lost opportunity did not apply.

The trial court determined that there was sufficient evidence to go to a jury under a traditional medical malpractice theory: "In this particular case, we've got a continuum of things. We've got an injury, plain and simple. Then whatever was the outcome of that injury is another matter. Enduring the surgery was one thing. Getting the better result afterwards is something else."

After the close of proofs, the trial court instructed the jury that, in order to award damages, it had to find that Bixler breached the standard of care and that the breach caused Taylor harm. Specifically, the trial court instructed the jury that it had to find that Bixler's failure to diagnose resulted in a worsening of Taylor's condition—that is, the trial court framed the case as an aggravation case. Defendants' trial counsel objected to this instruction and argued that the trial court should have instructed the jury on the lost opportunity for a better outcome. The trial court disagreed. The court, however, did not determine that the case did not involve a lost opportunity and therefore did not require a lost opportunity instruction. Rather, it based its decision on the fact that the parties' evidence and positions at trial were such that either there was clearly a more than 50 percent loss of opportunity or there was no loss of opportunity at all.

After the trial, defendants moved for JNOV. Defendants argued, in relevant part, that the trial court should grant the motion because plaintiffs failed to meet their burden of proving that Taylor lost a greater than 50 percent opportunity for a better outcome. The trial court denied the motion.

### C. LOST OPPORTUNITY CASES

Defendants' claims that the trial court erred when it refused to direct a verdict in their favor or grant their

motion for JNOV presume that the second sentence of MCL 600.2912a(2) applied to this case and imposed a burden on plaintiffs that plaintiffs failed to meet and about which the trial court failed to properly instruct the jury. MCL 600.2912a(2) generally addresses the burden of proof in medical malpractice actions:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.

Although the second sentence appears to apply to all medical malpractice actions, the second sentence also limits its application to those medical malpractice actions that seek recovery for a specific type of harm: lost opportunity. Therefore, the second sentence does not appear to apply to traditional claims that a physician's breach of the standard of care proximately caused a concrete injury as opposed to a lost opportunity to survive or for a better outcome. Our Supreme Court recently examined this very issue in *Stone v Williamson*, 482 Mich 144; 753 NW2d 106 (2008).

In *Stone*, the plaintiff had an abdominal aortic aneurysm that went undetected despite physical examination and testing. *Id.* at 147 (opinion by TAYLOR, C.J.). The aneurysm eventually ruptured and the plaintiff underwent emergency surgery to repair the rupture. *Id.* at 147-148. The plaintiff ultimately had to have his legs amputated at mid-thigh and suffered other severe complications, which were in part due to preexisting conditions. *Id.* at 148. The plaintiff later sued his radiologist for negligently failing to diagnose the aneurysm, which

the plaintiff alleged led to the rupture and all the resultant harm. At trial, the plaintiff presented evidence that, had the aneurysm been detected, he could have had elective surgery to repair it; he also presented evidence that there was a 95 percent chance that a patient who has elective surgery to repair such an aneurysm will have a good result, which included surviving the rupture as well as avoiding medical complications. *Id.* On appeal, our Supreme Court had to in part determine whether the requirements set forth in the second sentence of MCL 600.2912a(2) applied to the plaintiff's case. *Id.* at 150. Six justices of the Supreme Court concluded that MCL 600.2912a(2) did not apply to the facts of that case.

Chief Justice TAYLOR, who was joined by Justices CORRIGAN and YOUNG, noted that the lower courts had assumed that the second sentence of MCL 600.2912a(2) applied to the plaintiff's claims. *Id.* at 151. However, the plaintiff argued that he did not plead a claim for loss of an opportunity and, instead, argued that his claim was "a simple case of physical injury directly caused by negligence." *Id.* Chief Justice TAYLOR agreed that the lost opportunity doctrine was a unique theory of recovery that was distinct from traditional medical malpractice actions: " 'This theory is potentially available in situations where a plaintiff cannot prove that a defendant's actions were the cause of his injuries, but can prove that the defendant's actions deprived him of a chance to avoid those injuries.' " *Id.* at 152, quoting *Vitale v Reddy*, 150 Mich App 492, 502; 389 NW2d 456 (1986). Chief Justice TAYLOR explained that this theory of liability was adopted by the Supreme Court in *Falcon v Mem Hosp*, 436 Mich 443; 462 NW2d 44 (1990). See *Stone*, 482 Mich at 153-154 (discussing the *Falcon* decision). Before the decision in *Falcon*, he stated, "medical-malpractice plaintiffs alleging that the defen-

dant's act or omission hastened or worsened the injury (such as by failing to diagnose a condition) had to prove that the defendant's malpractice more probably than not was the proximate cause of the injury." *Id.* at 154-155.

Chief Justice TAYLOR then proceeded to examine the Legislature's apparent response to *Falcon*. He stated that the Legislature added the language now found in MCL 600.2912a(2) just three years after the decision in *Falcon*. *Id.* at 155-157. Chief Justice TAYLOR concluded that the two sentences in MCL 600.2912a(2) create a paradox that cannot be reconciled; namely, the first sentence requires a plaintiff to prove proximate cause in medical malpractice cases, but the second sentence refers to cases "in which such proof not only is unnecessary, but is impossible." *Id.* at 157. Because the second sentence of MCL 600.2912a(2) cannot be enforced as written, Chief Justice TAYLOR determined that a plaintiff should be left with the traditional burden in medical malpractice cases: the plaintiff must show that he or she suffered a present physical injury to person or property that was more likely than not caused by the defendant's breach of the applicable standard of care. *Id.* at 161. For this reason, Chief Justice TAYLOR concluded that the trial court erred when it instructed the jury that it had to find that the plaintiff in *Stone* had lost a greater than 50 percent opportunity for a better result. *Id.* at 162. However, he determined that the error did not warrant relief, because the jury clearly found that the traditional elements had been met—that is, that "defendants' negligence more probably than not caused plaintiff's injuries." *Id.* at 163.

Justice CAVANAGH, who was joined by Justices WEAVER and KELLY, agreed that the evidence presented in *Stone* supported a traditional medical malpractice

claim, but did not agree that MCL 600.2912a(2) was unenforceable. *Id.* at 165 (opinion by CAVANAGH, J.). Justice CAVANAGH argued that the Legislature's amendment of MCL 600.2912a explicitly recognized a cause of action for the loss of an opportunity to achieve a better result. *Id.* at 172. Further, Justice CAVANAGH argued that, when MCL 600.2912a(2) is interpreted in light of the decision in *Falcon*, it can be rationally applied. *Id.* at 175-177. Specifically, Justice CAVANAGH noted that the second sentence of MCL 600.2912a(2) "cannot limit recovery for the loss of an opportunity to cases in which the loss was greater than 50 percent, because any plaintiff who satisfied that condition would have a traditional medical-malpractice claim for the death or physical harm itself." *Id.* at 175-176. For that reason, Justice CAVANAGH concluded that the second sentence must establish a threshold for those cases in which the plaintiff cannot prove by a preponderance of the evidence that the defendant's malpractice caused a specific physical harm—that is, the plaintiff can still recover for the lost opportunity when the change in the opportunity was less than 50 percent as long as the opportunity was at least 50 percent to begin with. *Id.* at 176-178. Nevertheless, Justice CAVANAGH agreed with Chief Justice TAYLOR that there was evidence from which the jury could have concluded by a preponderance of the evidence that the malpractice in that case actually caused the injuries at issue; for that reason, the plaintiff "did not assert, or need to resort to, a claim for loss of opportunity." *Id.* at 178. Because the plaintiff in *Stone* proved a traditional medical malpractice claim based on his physical injuries, Justice CAVANAGH agreed that the jury verdict should be upheld. *Id.*

Justice MARKMAN agreed with Justice CAVANAGH that MCL 600.2912a(2) was enforceable and provided a cause of action to recover for the loss of an opportunity

to achieve a better result, but disagreed about the proper application of the threshold provided under the second sentence. *Id.* at 218-219 (opinion by MARKMAN, J.). Justice MARKMAN concluded that a lost opportunity case is any case in which "it is possible that the bad outcome would have occurred even if the patient had received proper treatment." *Id.* at 218. Because the plaintiff in *Stone* might have had to have his legs amputated even with proper treatment, Justice MARKMAN determined that the case was a lost opportunity case. However, Justice MARKMAN concluded that the case should still be affirmed because the lost opportunity was more than 50 percent. *Id.* at 219.

Thus, four justices agreed that MCL 600.2912a(2) is enforceable and recognizes a cause of action for lost opportunity that is separate and distinct from the traditional medical malpractice claim. In addition, six justices agreed that a plaintiff need not rely on the lost opportunity cause of action when the plaintiff can show by a preponderance of the evidence that the medical malpractice caused a specific physical harm. In such a case, the plaintiff may plead and prove a claim based on traditional medical malpractice and MCL 600.2912a(2) will not apply. Consequently, whether the second sentence of MCL 600.2912a(2) applies depends on the nature of the claims brought by the plaintiff; if the plaintiff only brought a traditional medical malpractice claim, the second sentence of MCL 600.2912a(2) will not apply and the plaintiff will be left with the traditional burden of proof. See *Ykimoff v W A Foote Mem Hosp*, 285 Mich App 80, 99; 776 NW2d 114 (2009) (opinion by TALBOT, P.J.) (stating that there was no basis for this Court to review the case as a lost opportunity case under MCL 600.2912a(2) because a review of the lower court record revealed that the plaintiff only pleaded a traditional medical malpractice claim); *Velez v*

*Tuma*, 283 Mich App 396, 407; 770 NW2d 89 (2009) (stating that the burden of proof under MCL 600.2912a(2) did not apply to the case at issue because the case was a traditional medical malpractice case).

#### D. THE NATURE OF PLAINTIFFS' CLAIM

As this Court recently noted, a " 'plaintiff's theory in a medical malpractice case must be pleaded with specificity and the proofs must be limited in accordance with the theories pleaded.' " *Ykimoff*, 285 Mich App at 99 (opinion by TALBOT, P.J.), quoting *Badalamenti v William Beaumont Hosp-Troy*, 237 Mich App 278, 284; 602 NW2d 854 (1999), citing, in part, MCR 2.111(B)(1). The level of specificity required under MCR 2.111(B)(1) is that level which reasonably informs the adverse party of the nature of the claims against him or her. *Weymers v Khera*, 454 Mich 639, 654; 563 NW2d 647 (1997). A plaintiff's complaint should not be so ambiguous as to leave the defendant to " 'guess upon what grounds [the] plaintiff believes recovery is justified' "; such extreme ambiguity " 'violates basic notions of fair play and substantial justice' " and undermines the defendant's " 'opportunity to present a defense.' " *Id.*, quoting *Dacon v Transue*, 441 Mich 315, 329; 490 NW2d 369 (1992).

In the present case, plaintiffs alleged that Bixler undertook "to examine, diagnose, treat, attend, and care" for Taylor. Further, Bixler violated the standard of care and was "guilty of negligence and malpractice," in relevant part, by "[f]ailing to properly review and interpret the foot x-rays of [Taylor] taken at [St. Mary's] on or about December 8, 2003" and by "[f]ailing to provide [Taylor] with a proper review and interpretation of foot x-rays taken on or about that same time[.]" These failings, plaintiffs further alleged,

"caused Richard Taylor's talar fracture to remain untreated, undiagnosed, and to progressively worsen, and necessitated extensive surgical intervention" and caused Taylor to suffer "ongoing disability, loss of earnings and earning potential, pain, suffering, disfigurement and emotional distress."

From an examination of plaintiffs' complaint, it is evident that plaintiffs alleged a traditional medical malpractice claim. Indeed, there is not one reference to a lost opportunity to achieve a better outcome in the complaint; rather, plaintiffs alleged that Bixler breached the standard of care and that his breach proximately *caused* a worsening of Taylor's talar fracture. This same allegation was repeated in the affidavit of merit signed by plaintiffs' expert radiologist and attached to the complaint.

The first time plaintiffs made any assertion that could be construed to implicate a lost opportunity claim was in their trial brief. In that brief, plaintiffs summarized the expert testimony and noted that "both Dr. Gilbert and Dr. [Christopher] Chiodo agree that [Taylor] would have had a greater than 50 percent chance of a better outcome" had it not been for Bixler's failure to diagnose the fracture. However, in this same section plaintiffs alleged that the evidence showed that the failure to diagnose led to a worsening of the fracture. Further, plaintiffs also clearly stated that Bixler's malpractice constituted an aggravation of a preexisting injury.

Plaintiffs also did not amend or move to amend their complaint to include a lost opportunity claim and did not ask the trial court to instruct the jury on such an alternative basis for relief. Indeed, during his opening statement, plaintiffs' trial counsel indicated his belief

that the evidence would show that Bixler's failure to diagnose the fracture led to an aggravation of the fracture:

> Now, it's going to be our position in this case that, because of this delay, there was an aggravation of the fracture to the point that Rich is disabled from doing the kind of work that he did before.
>
> I will concede to you that he had a fracture in December, and that is a serious injury, we'll concede that all day long. But because that fracture was not diagnosed and reported, that condition became aggravated, as I've shown you in the X-rays and as the experts will testify, to the point that he's got a permanent disability in part because of the delayed diagnosis.

He also stated that the evidence would show that Bixler's failure to diagnose made the initial surgery to repair Taylor's talus more difficult and ultimately caused Taylor to have to undergo a second surgery. Finally, although plaintiffs' counsel also mentioned that the evidence would show that Taylor would have had a greater than 50 percent chance of a better outcome had he been diagnosed properly in December 2003, he did so in the context of emphasizing that the proofs would show that Bixler's negligence caused the bad outcome—namely the early onset of arthritis. See, e.g., *Stone*, 482 Mich at 160 (opinion by TAYLOR, C.J.) (noting that a plaintiff who has a greater than 50 percent initial likelihood of obtaining a better result—such as survival—can support a traditional medical malpractice claim).

On the basis of plaintiffs' complaint alone, we conclude that this case did not involve a lost opportunity claim. See *Ykimoff*, 285 Mich App at 99; *Velez*, 283 Mich App at 407. Moreover, examining plaintiffs' complaint, trial brief, and statements at trial in context, it is clear that plaintiffs framed their claim as a traditional medical malpractice claim. Defendants cite no authority for

the proposition that a plaintiff can be held to a burden of proof for a cause of action that the plaintiff did not bring. MCL 600.2912a(2) did not apply to plaintiffs' claim, and plaintiffs were not required to present evidence about the degree by which Bixler's malpractice affected Taylor's opportunity for a better outcome. See *Fulton v William Beaumont Hosp*, 253 Mich App 70; 655 NW2d 569 (2002); *Klein v Kik*, 264 Mich App 682; 692 NW2d 854 (2005). If defendants felt that plaintiffs did not have the evidence to support their burden of proof for a traditional medical malpractice claim, defendants should have moved for summary disposition, directed verdict, or JNOV on the basis that plaintiffs' evidence was insufficient to prove by a preponderance that Bixler's malpractice caused Taylor's injuries. Instead, defendants tried to get the trial court to impose the burden of proof for a lost opportunity claim on plaintiffs' traditional medical malpractice claim. The trial court properly rejected that attempt. Further, even if defendants had challenged the sufficiency of plaintiffs' evidence in their motions for directed verdict or JNOV, those challenges would still have failed.

### E. CAUSATION

As already noted, this case involved only a traditional medical malpractice claim. For that reason, plaintiffs were not required to present evidence concerning the degree of any opportunity to achieve a better result that may have been lost by Bixler's negligence. Instead, plaintiffs only had to prove by a preponderance of the evidence that Bixler's failure to diagnose Taylor's fracture injured Taylor. *Craig v Oakwood Hosp*, 471 Mich 67, 86; 684 NW2d 296 (2004) (stating the elements of a traditional medical malpractice claim). Plaintiffs clearly met that burden.

" 'Proximate cause' is a legal term of art that incorporates both cause in fact and legal (or 'proximate') cause." *Id.* In order to establish that a particular action was the cause in fact of an injury, the plaintiff must show that " 'but for' the defendant's actions, the plaintiff's injury would not have occurred. On the other hand, legal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Skinner v Square D Co*, 445 Mich 153, 163; 516 NW2d 475 (1994) (citations omitted).

> Generally, an act or omission is a cause in fact of an injury only if the injury would not have occurred without (or "but for") that act or omission. While a plaintiff need not prove that the act or omission was the *sole* catalyst for his injuries, he must introduce evidence permitting the jury to conclude that the act or omission was *a* cause. [*Craig*, 471 Mich at 87.]

In this case, plaintiffs presented evidence that there was a worsening of Taylor's fracture between the time that Bixler examined Taylor's x-rays in December 2003 and the time when Taylor's fracture was properly diagnosed in March 2004. At trial, Bixler himself admitted that he had testified at his deposition that a comparison of the x-rays taken in December 2003 to a CT scan of Taylor's foot taken after the fracture was diagnosed revealed that the fracture had worsened. Plaintiffs' expert radiologist, Dr. Kevin Berger, also testified that the images from March 2004 revealed that the break had worsened: there were a few more millimeters of separation, there was a loss of smooth surfaces, and the fracture had extended into other areas of the anatomy. Similarly, defendants' expert radiologist, Dr. Donald Simon, testified that a comparison of images showed that the fracture had worsened by the time it was diagnosed. One of plaintiffs' expert orthopedic

surgeons, Dr. Christopher Chiodo, also confirmed that
the fracture had worsened by the time it was actually
diagnosed. He stated that there was a significant shift
in the fragments and that there was no longer a smooth
joint. Chiodo also connected Bixler's failure to diagnose
the fracture in December 2003 with the worsening of
the fracture. Chiodo explained that if you allow the
patient to walk on the fractured talus, "you expose
these fractures to tremendous repetitive cyclical load-
ing, thousands of heel strikes per day, it's not going to
heal and it's going to shift."

At trial, it was essentially undisputed that the aggra-
vation of the fracture not only made Taylor's first
reconstructive surgery harder to perform, but also
necessitated the second surgery. Kolodziej agreed that
the first surgery was much more difficult as a result of
the delay. She explained that with a fresh fracture the
surgery is significantly easier:

> [T]he anatomy is more preserved. You can free up the
> fracture fragments easier. You can identify the pieces
> easier. There's more mineralization in the bone that you
> can see it by X-ray easier as opposed to later on when
> things start to become fibrosed, full of scar tissue, and the
> edges are no longer sharp and clear and the bone is softer.

Kolodziej testified that it was her opinion that the
second surgery would not have been necessary had the
surgery been treated within the first couple of weeks
after the fracture. Further, Dr. John Anderson, defen-
dants' expert in orthopedic surgery testified that the
delay in treatment resulted in a more difficult first
surgery and likely caused the need for the second
surgery. Accordingly, plaintiffs plainly established that
Bixler's failure to diagnose Taylor's talar fracture in
December 2003 proximately caused the need for a
second surgery.

In addition, there was ample testimony to show that, but for Bixler's failure to diagnosis the fracture, Taylor would not have suffered further physical injury. Chiodo testified at length about the evidence that Taylor was developing progressive arthritis in his subtalar joint. Chiodo testified that, where cartilage is not congruent in a joint, the motion of the bones "will erode or destroy the articular cartilage," which he explained *is* arthritis: "Arthritis is the loss of cartilage so that the two bones that form the joint no longer glide smoothly but grind with bone on bone, if you will." Chiodo indicated that with early treatment, Taylor might not have developed arthritis or might have developed less severe arthritis. Indeed, he testified that there was a "much greater chance, more than 50 percent, that [Taylor] would either not develop arthritis or develop less severe arthritis . . . ." However, Chiodo opined that the delay in the diagnosis caused the progressive arthritis that was already visible:

> Yes. Again, you have these two fracture fragments. The joints aren't lined up. The cartilage isn't in place and then you subject that malaligned cartilage to repetitive loads and repetitive weight bearing and repetitive motions and that leads to erosion of that cartilage because it wasn't protected or put back into place or held with screws.

Thus, although Chiodo left open the possibility that Taylor might still have developed some level of arthritis, he testified that Taylor already had arthritis and that it was caused when Taylor was permitted to bear weight on his fractured talus and was more severe than what it would have been. Chiodo further testified that Taylor's foot would have been more functional had it been treated earlier and stated that a "substantial" portion of Taylor's current disability was attributable to the delay in the diagnosis of the fracture.

Similarly, plaintiffs' other expert orthopedic surgeon, Dr. James Gilbert, testified that "it's fair to say and true that [Taylor] would have developed some arthritis in his ankle or subtalar joint even if he had been treated in December." However, he also opined that the delay directly caused "the degree of arthritis" to be "much greater." Gilbert also stated that Taylor was already a candidate for fusion of the subtalar joint. Gilbert testified that, had there been no delay in treatment, "the degree of arthritis would have been much, much less and would have occurred at a much later date than it has" and that the need for a fusion of the joint would have been delayed.

Given this testimony, plaintiffs presented sufficient evidence to prove that Bixler's failure to diagnose Taylor's talar fracture *directly* caused Taylor's current level of arthritis and, even though he might have eventually developed some arthritis, the delay in the diagnosis accelerated the rate of development and increased the severity of the arthritis. This in turn accelerated the timetable for the need to have fusion surgery.

F. CONCLUSION

Plaintiffs did not plead a claim for a lost opportunity to achieve a better result. Therefore, the second sentence of MCL 600.2912a(2) did not apply to plaintiffs' malpractice claim. See *Ykimoff*, 285 Mich App at 99; *Velez*, 283 Mich App at 407. Because plaintiffs only alleged a traditional medical malpractice claim and presented sufficient evidence from which a jury could conclude that Bixler's malpractice proximately caused Taylor's injuries, defendants were not entitled to a directed verdict or JNOV. *Sparks*, 372 Mich at 202.

For the same reason, we also conclude that the trial court did not err when it refused to instruct the jury on the burden imposed by the second sentence of MCL 600.2912a(2). Plaintiffs never pleaded a lost opportunity claim; rather, plaintiffs' claim was grounded in ordinary medical malpractice. For that reason, the trial court was not required to give an instruction on the burden of proof applicable to lost opportunity claims. See *Stone*, 482 Mich at 162-163 (opinion of TAYLOR, C.J.), *id.* at 178 (opinion of CAVANAGH, J.); *Velez*, 283 Mich App at 407 (stating that the jury instruction concerning lost opportunity is not applicable to cases involving traditional medical malpractice).

### III. COMPARATIVE NEGLIGENCE

#### A. STANDARDS OF REVIEW

Defendants next argue that the trial court erred when it directed a verdict in plaintiffs' favor on defendants' defense of comparative negligence. This Court reviews de novo a trial court's decision with regard to a motion for a directed verdict. *Sniecinski*, 469 Mich at 131. This Court also reviews de novo the proper interpretation of statutes and court rules. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

#### B. APPLICATION OF COMPARATIVE NEGLIGENCE

The statutes governing comparative negligence require the trier of fact to allocate liability "in direct proportion to the person's percentage of fault" for "personal injury, property damage, or wrongful death"—that is, the statutes seek to assign liability to persons in direct proportion to that person's fault for the injury that is the subject of the suit. MCL 600.2957(1); see also MCL 600.2959; MCL 600.6304. For that reason, the

allocation of fault is necessarily limited to fault for the injury for which the plaintiff seeks damages. See MCL 600.2957(1); MCL 600.2959; MCL 600.6304(2) (stating that the trier of fact shall examine the conduct of each person at fault and the "causal relation between the conduct and the damages claimed" when determining the percentages of fault); MCL 600.6304(8) (defining fault, in relevant part, as conduct that proximately caused the *damage* sustained by a party); *Lamp v Reynolds*, 249 Mich App 591, 596; 645 NW2d 311 (2002) (stating that the enactment of the comparative fault statutes reveals "a legislative intent to allocate liability according to the relative fault of all the persons contributing to the accrual of a plaintiff's damages.").

In the present case, plaintiffs did not sue to recover damages for Taylor's original foot injury; plaintiffs sued to recover damages resulting from the *aggravation* of Taylor's foot injury. Understood in this light, defendants would have had the jury reduce plaintiffs' award of damages for the aggravation of Taylor's preexisting injury on the basis of his alleged negligent conduct that did not contribute to the accrual of the damages for the aggravation. However, because the statutes imposing comparative fault only require the allocation of liability in proportion to the fault for the injury for which the plaintiff is seeking damages, under the facts of this case, plaintiffs could only be allocated liability to the extent that they were at fault for the aggravation of the preexisting foot injury.

At trial, there was no evidence that Taylor acted unreasonably with regard to the treatment of his injured foot—that is, there was no evidence that Taylor bore any fault for the aggravation of his foot injury. Indeed, at trial defendants conceded that there was no evidence that Taylor failed to follow his physician's instructions for the

treatment of his foot injury, and Bixler conceded that it was reasonable for Taylor's physician to rely on his evaluation of the x-rays and proceed accordingly. Because Taylor did not engage in any conduct that could be construed to have aggravated his foot injury, the trial court properly directed a verdict in plaintiffs' favor on the issue of comparative negligence.[4]

In any event, even if we were to conclude that the jury should have been permitted to consider Taylor's possible fault for his original foot injury, we would nevertheless conclude that the trial court properly directed a verdict on this issue. Defendants failed to present any evidence that Taylor's original injury was the result of his own negligence, and there was no other evidence from which the jury could have concluded that Taylor was negligent.

### C. EVIDENCE OF NEGLIGENCE FOR THE ORIGINAL INJURY

At trial, Taylor testified that his fall should never have happened, but did not explain how the fall actually occurred. He noted that he was "on beach sand with the ladder" and the sand gave way. He stated that he tried to jump down, but his foot got caught in the ladder.

From this testimony, the jury could only have speculated concerning whether Taylor fell as a result of his own negligence. There was no testimony about who owned the ladder, who set the ladder up, the condition of the ladder,

---

[4] Defendants' reliance on *Shinholster v Annapolis Hosp*, 471 Mich 540; 685 NW2d 275 (2004), for the proposition that comparative negligence may be assigned for any and all pretreatment negligence, including negligence that did not cause the injury for which damages are sought, is misplaced. Our Supreme Court's opinion makes it clear that comparative fault may only be assigned for pretreatment conduct if the pretreatment conduct proximately caused the injury at issue. *Id.* at 551. In this case, the injury at issue was the aggravation of the preexisting condition, not Taylor's original foot injury. But see *id.* at 553 n 9.

the condition of the terrain, whether there were others present, whether the sand shifted as a result of some outside force, or any of a host of other possibilities. Absent more concrete facts establishing that Taylor was responsible for his own fall, a jury could not reasonably have found that Taylor's negligence proximately caused his original foot injury. The best that can be said of the theory that Taylor's own negligence must have caused his original injury is that the theory was consistent with the known facts. However, mere consistency with the known facts is not enough; the theory must be deducible from those facts or it is mere conjecture. *Skinner*, 445 Mich at 164. And when a party's theory of causation is merely conjecture, the trial court has a duty to direct a verdict on that issue. *Id.* at 165.

Moreover, defendants' reliance on the doctrine of res ipsa loquitur does not save their defense from this evidentiary deficiency. The doctrine of res ipsa loquitur permits an inference of negligence from circumstantial evidence when a party is otherwise unable to prove the occurrence of a negligent act. *Jones v Porretta*, 428 Mich 132, 150; 405 NW2d 863 (1987). In order to rely on res ipsa loquitur, defendants had to show, in relevant part, that the event at issue was caused " 'by an agency or instrumentality' " within Taylor's exclusive control. *Id.* at 150-151 (citation omitted). In this case, there was no evidence that the ladder or worksite where the ladder was placed was under Taylor's exclusive control. Because the ladder might have been improperly placed by another worker or might have shifted through some action by a third party, one cannot infer from the fall of the ladder alone that Taylor was negligent. Consequently, res ipsa loquitur does not establish an inference of negligence.

For these reasons, the trial court did not err when it directed a verdict in favor of plaintiffs on the issue of comparative negligence.

### IV. HOUSEHOLD SERVICES AS ECONOMIC DAMAGES

#### A. STANDARDS OF REVIEW

We shall next address defendants' claims of error concerning the characterization and presentation of evidence of plaintiffs' economic losses. This Court reviews a trial court's evidentiary decisions for abuse of discretion. *Craig*, 471 Mich at 76. This Court reviews de novo the proper interpretation of statutes. *Estes*, 481 Mich at 578-579.

#### B. ECONOMIC LOSSES

Defendants first appear to argue that, under the facts of this case, Taylor's economic damages do not include the costs that he will incur to hire persons to perform the household tasks that he would otherwise have performed. For this reason, defendants contend, the trial court erred to the extent that it characterized or permitted the characterization of these services as involving economic losses.

In a medical malpractice action, the trier of fact must divide an award of damages into those for past economic, past noneconomic, future economic, and future noneconomic losses. See MCL 600.1483(2) (referring to damages for economic loss and damages for noneconomic loss); MCL 600.6305(1). Although economic losses are not defined in MCL 600.1483 or MCL 600.6305, this Court has turned to the definition provided in MCL 600.2945(c) in order to determine whether a claim for damages in a medical malpractice action should be characterized as one for economic or noneconomic losses. *Thorn v Mercy Mem Hosp Corp*, 281 Mich App 644, 664-665; 761 NW2d 414 (2008). Under MCL 600.2945(c), economic losses are defined as

> objectively verifiable pecuniary damages arising from
> medical expenses or medical care, rehabilitation services,
> custodial care, loss of wages, loss of future earnings, burial
> costs, loss of use of property, costs of repair or replacement
> of property, costs of obtaining substitute domestic services,
> loss of employment, or other objectively verifiable mon-
> etary losses.

This definition clearly includes the costs incurred to
replace services—including substitute domestic services—
that would have been performed by the injured person.
Further, this Court has explicitly held that such replace-
ment costs are economic losses. *Thorn*, 281 Mich App at
666-667. Consequently, the trial court did not err when it
characterized the cost of replacement services as economic
losses or permitted plaintiffs to characterize them as such.

Defendants also appear to argue that economic losses
include only those costs that a party has actually
incurred: "Absent evidence that Mr. and Mrs. Taylor
incurred some costs to replace those services that Mr.
Taylor would otherwise perform, this item of damage is
definitely not an 'economic loss.' " It is difficult to see
how an injured party can incur a cost based on the need
to hire a person to perform a service that the injured
party would have performed before the point in time
when the injured party would have performed it; nev-
ertheless, it is well settled that a finder of fact can
award damages for economic losses that a plaintiff has
not yet incurred.[5] See MCL 600.6305(1) (requiring the
trier of fact to make specific findings concerning future
economic loss and the periods over which they will
accrue); MCL 600.6305(2) (noting that the calculation

---

[5] This is in contrast to some statutory causes of action, such as that
under the no-fault act's replacement services provision, which requires a
replacement service to be reasonably incurred before it becomes com-
pensable. See MCL 500.3107(1)(c).

must be based on the costs and losses during the period that the plaintiff will sustain those costs and losses). Further, to the extent that defendants argue that there is no evidence that plaintiffs incurred past economic losses for replacement services because family and friends donated the replacement services, we note that the jury did not award any past economic damages other than the cost of Taylor's second surgery. For that reason, even if we were to conclude that Taylor's past economic damages were somehow limited to costs that he had actually incurred, the jury's award of past economic damages was clearly supported by the evidence. Moreover, to the extent that defendants argue that there was no evidence at trial that plaintiffs will incur future costs for replacement services, defendants are incorrect.

At trial, Taylor testified that he performed the remodeling work on his home up until the time of his injury and that a substantial amount of work remained to be done. He said that he would probably need to pay someone $35,000 to complete the work that remained. Taylor also said that he did all the maintenance work on the family vehicles, but could no longer perform the maintenance and was unable to do the work around the house that he used to do. Further, although Taylor admitted that he had had help from family and friends up to the time of the trial, he also testified that he had had to hire others to perform some of the work that he could no longer perform. Thus, there was evidence that Taylor performed specific services that he can no longer perform and that he has in fact hired people to perform those services in the past and presumably will have to continue to hire people to perform those services in the future. Consequently, there was a sufficient basis for plaintiffs' expert economist, Scott Vander Linde, to testify concerning the future costs to replace those services. See MRE 703.

The trial court did not abuse its discretion when it permitted plaintiffs' expert economist to testify about the future costs to replace the services that Taylor would have performed. Likewise, the trial court did not err by characterizing the costs to replace services that Taylor would have performed as economic losses.

## V. DEFENDANTS' MOTION FOR REMITTITUR

### A. STANDARD OF REVIEW

Finally, defendants argue that the trial court erred when it denied their motion for a new trial or remittitur based on an excessive award of damages. This Court reviews for abuse of discretion a trial court's decision to deny a motion for remittitur. *Unibar Maintenance Services, Inc v Saigh*, 283 Mich App 609, 629; 769 NW2d 911 (2009).

### B. REMITTITUR

The power of remittitur should be exercised with restraint. *Shaw v City of Ecorse*, 283 Mich App 1, 17; 770 NW2d 31 (2009). When deciding whether to grant a motion for remittitur, the trial court must examine all the evidence in the light most favorable to the nonmoving party to determine whether the evidence supported the jury's award. *Id.* "If the award falls reasonably within the range of the evidence and within the limits of what reasonable minds would deem just compensation, it should not be disturbed." *Id.*, citing *Palenkas v Beaumont Hosp*, 432 Mich 527, 532-533; 443 NW2d 354 (1989).

In this case, defendants' claim for remittitur depends on two assumptions: (1) that the jury's award of damages could not reflect Taylor's future lost income as a result of the aggravation of his foot injury and, for that

reason, (2) the award must represent the cost to replace future services, for which there was no evidence. As already noted, there was sufficient evidence to support the testimony of plaintiffs' expert concerning the projected cost to replace the services that Taylor had performed in the past but would no longer be able to perform. In addition, the jury's decision not to award past economic damages for lost income does not necessitate the conclusion that the jury must also have found that Taylor would not suffer future lost income as a result of the aggravation of his foot injury. The jury may reasonably have concluded that Taylor's income loss up to the time of trial was largely a function of his original injury and, for that reason, refused to award him damages for past lost income. Nevertheless, the jury could still reasonably have concluded that Taylor would suffer a future loss of income and could reasonably have concluded that a portion of that loss was attributable to the aggravation of his foot injury. At trial, plaintiffs' expert economist opined that the cost to replace Taylor's services over the course of the remainder of his life would be $677,509. He also opined that Taylor's lost income during the remainder of his life would be $387,983. Although the combined total of these losses is more than $1 million, the jury determined that Taylor was only entitled to $262,900 in future economic damages. This amount falls reasonably within the range supported by the evidence and otherwise appears just; therefore, the trial court did not err when it declined to disturb this award. *Shaw*, 283 Mich App at 17.

VI. MOTION TO RECALL JUDGE KOLENDA

A. STANDARD OF REVIEW

On cross-appeal, plaintiffs first argue that the trial court erred when it refused to ask for the recall of Judge

Kolenda to hear plaintiffs' motion for additur or a new trial. This Court reviews a trial court's discretionary decisions for abuse. *Herald Co, Inc v Eastern Michigan Univ Bd of Regents*, 475 Mich 463, 471-472; 719 NW2d 19 (2006). And this Court will not disturb the trial court's decision unless it falls outside the range of principled outcomes. *Id.* at 472.

### B. ANALYSIS

On May 23, 2008, plaintiffs filed a motion in which they asked the trial court to "ask" the court administrator to pursue the steps necessary to recall Judge Kolenda. Although the trial court may not have had the authority to directly recall Judge Kolenda, see MCL 600.226, it surely had the authority to at least *request* that he be recalled. Nevertheless, it cannot be said that the trial court abused its discretion by refusing to make such a request. There was no indication that the trial court was incapable of deciding plaintiffs' motion on the merits and according to the law. Likewise, there was no evidence that the court administrator would have granted the request and no evidence that Judge Kolenda would have been available had such a request been made. Therefore, on these facts, one cannot conclude that the trial court abused its discretion when it refused to "ask" for Judge Kolenda to be recalled to hear the motion.

### VII. PLAINTIFFS' MOTION FOR ADDITUR OR A NEW TRIAL

### A. STANDARD OF REVIEW

Finally, plaintiffs argue that the trial court erred when it denied plaintiffs' motion for a new trial or additur. This Court reviews a trial court's decision on a motion for additur or a new trial for abuse of discretion. *Kelly v Builders Square, Inc*, 465 Mich 29, 34; 632 NW2d 912 (2001).

B. ADDITUR OR NEW TRIAL

Our court rules permit a trial court to grant a new trial when a verdict is "clearly or grossly inadequate or excessive" or when the verdict is "against the great weight of the evidence . . . ." MCR 2.611(A)(1)(d) and (e). However, as an alternative, when the trial court determines that the only error in the trial was the "inadequacy or excessiveness of the verdict," the trial court may deny the motion for a new trial on the condition that the nonmoving party consent to the entry of a judgment "in an amount found by the court to be the lowest (if the verdict was inadequate) or highest (if the verdict was excessive) amount the evidence will support." MCR 2.611(E)(1). Whether a jury's verdict is clearly or grossly inadequate or against the great weight of the evidence necessarily depends on the nature of the evidence adduced at trial. See *Kelly*, 465 Mich at 39. This is because the plaintiff has the burden to prove each element of his or her case, and damages such as medical expenses are distinct from damages for things such as pain and suffering. *Id.* Further, this Court will defer to the judgment of the jury on the weight to be accorded the evidence concerning damages: "In short, the jury is free to credit or discredit any testimony. It may evaluate the evidence on pain and suffering differently from the proof of other damages. No legal principle requires the jury to award one item of damages merely because it has awarded another item." *Id.*

In this case, plaintiffs have not identified any evidence that the jury's decision to award only economic damages was motivated by passion or prejudice. See MCR 2.611(A)(1)(c). Rather, plaintiffs argue that the jury's decision not to award noneconomic damages is inconsistent with its decision to award economic dam-

ages and is against the great weight of the evidence of noneconomic damages presented at trial.

At trial, plaintiffs presented relatively little testimony concerning Taylor's noneconomic damages. With regard to pain, Taylor testified that his original injury was "sorer than the dickens," but he did not testify much about his pain and suffering during treatment and after his corrective surgeries. Further, although there were records that indicate that Taylor complained about pain to his physicians and there was testimony that such an injury would be painful, there were also records and testimony that he did not require extensive measures to treat pain. Similarly, Taylor testified about how his injury affected his ability to work with his company and around his home, but he only briefly mentioned how the injury had affected his social and leisure life. He testified that he was on medication for depression and that the loss of his ability to advance his business had affected him emotionally, but he also admitted that he was being treated for depression before the accident.

Karen Taylor testified more extensively about the effect of Taylor's injury on their social lives. She testified that, since the injury, she and her husband did not go boating, ride motorcycles, or garden together. She also testified that he did not hunt or fish anymore. She stated that the injury had affected their relationship "a little bit" because Taylor seemed a little angry and had sad moments. Karen Taylor did not, however, testify about the severity of the changes or the importance of the activities they once did together.

Although the testimony and evidence could have supported some measure of noneconomic damages, a reasonable jury could also have concluded that plaintiffs failed to meet their burden of proof. See *Kelly*, 465

Mich at 39; see also *Taylor v Mobley*, 279 Mich App 309, 314-315; 760 NW2d 234 (2008) (stating that the jury was free to disbelieve the plaintiff's testimony regarding noneconomic damages and to credit all countervailing evidence on the issue). As already noted, Taylor himself gave very little testimony about the effects of the injury on his activities other than his ability to perform chores and work in his business. Likewise, although Karen Taylor's testimony supported the conclusion that she and Taylor had suffered noneconomic damages, her testimony was understated and did not go into detail. Under these facts, plaintiffs have failed to establish that the jury's decision not to award noneconomic damages was clearly or grossly inadequate or contrary to the great weight of the evidence. Therefore, the trial court did not err when it denied plaintiffs' motion for additur or a new trial based on an inadequate award of damages.

There were no errors warranting relief.

Affirmed. Because none of the parties prevailed in full on appeal, none of the parties may tax costs. MCR 7.219(A).

K. F. KELLY, J. I concur in the result only.