*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHAEL BENIGNI, Personal Representative of
the ESTATE OF PATRICIA BENIGNI,

      Plaintiff-Appellant,

v

SAMIR ALSAWAH, M.D., and HURON
MEDICAL CENTER, PC,

      Defendants-Appellees.

FOR PUBLICATION
September 8, 2022
9:05 a.m.

No. 357033
St. Clair Circuit Court
LC No. 19-001198-NH

Before: MARKEY, P.J., and SHAPIRO and PATEL, JJ.

PATEL, J.

The dispositive question in this medical malpractice case is whether plaintiff's claim is a traditional medical malpractice claim or one that involves a lost opportunity to achieve a better result. Plaintiff, the Estate of Patricia Benigni, alleges that defendants Samir Alsawah, M.D., and Huron Medical Center (HMC) failed to timely diagnose Patricia's recurrence of colorectal cancer, causing Patricia to suffer adverse sequela, including death. The Estate alleged that as a direct and proximate result of defendants' negligence, Patricia's undiagnosed cancer metastasized. Catching the recurrence earlier would have given Patricia a better prognosis, including survival and a cure.

In the summary disposition proceedings, both parties and the trial court characterized this case as a "lost opportunity case," implicating the second sentence of MCL 600.2912(a)(2). This was error. Because Patricia actually suffered an adverse result (in this case death), this is a traditional medical malpractice case, not one for lost opportunity. We therefore reverse the trial court order granting summary disposition and remand this case to the trial court to determine whether the Estate can establish proximate causation under traditional malpractice principles.

## I. BACKGROUND

### A. ORIGINAL DIAGNOSIS OF CANCER AND MEDICAL HISTORY

In 2012, Patricia was diagnosed with stage III colorectal cancer. She was referred to HMC and Dr. Alsawah, a board-certified medical oncologist, in November 2012. Patricia received neoadjuvant chemotherapy and radiation treatment to prepare for surgery. Subsequently, a

-1-

resection to remove the tumor was performed in February 2013. From March to September 2013, Patricia received nine rounds of adjuvant chemotherapy to lower the risk of recurrence and to address lymph node concerns. Throughout 2013, Dr. Alsawah checked and monitored Patricia's carcinoembryonic antigen (CEA) level approximately every four to six weeks, with the level ranging from 1.6 to 4.4 nanograms per milliliter of blood (ng/mL) in nine separate tests. An abdominal and pelvic computerized tomography (CT) scan did not reveal recurrence or spread of the cancer.

Monitoring CEA levels in patients is a critical indicator for discovering cancer recurrence. In his deposition, Dr. Jeffrey Gordon, a board-certified medical oncologist and hematologist, testified that, based on his experience and review of peer-reviewed medical literature, a CEA level above 15 ng/mL rarely reflected a false indicator of colorectal cancer. And, according to Dr. Gordon, if the CEA level was over 35 ng/mL, "it was always associated with a recurrence of colorectal cancer."

In March 2014, Patricia's CEA level was checked again, and it measured 4.5 ng/mL. This was the only CEA test performed in 2014. Patricia's CEA level was 8.3 ng/mL in January 2015 and rose to 24.2 ng/mL in April 2015. By November 2015, her CEA level had once again risen, testing at 38.6 ng/mL. Despite the elevated CEA level, a CT scan performed in 2015 did not reveal a recurrence or spread of the cancer. Dr. Alsawah did not order any other diagnostic procedures or further explore the cause of the elevated CEA level.

For the next two years, Patricia's CEA levels continued to rise precipitously. Patricia had a CEA level of 59.3 ng/mL in May 2016. A CT scan and colonoscopy were performed but did not reveal a recurrence or metastasis of the cancer. When Patricia saw Dr. Alsawah on August 23, 2016, he again tested her CEA level, which measured 78.5 ng/mL. She also complained of fatigue. Again, Dr. Alsawah did not further explore the cause of the elevated CEA level. He also began scheduling Patricia for visits every six months.

In February 2017, Patricia's CEA level was 175.9 ng/mL. In August 2017, her CEA level measured 459 ng/mL, and Patricia complained of weakness and fatigue. A CT scan performed in August 2017 revealed a large liver mass suspicious of metastasis with possible involvement of the adrenal glands. There was no apparent indication of tumor recurrence at the original surgical site. A positron emission tomography (PET) scan also showed a large hepatic mass and additionally gave rise to cancer concerns regarding the right adrenal gland. Patricia had a liver biopsy on October 9, 2017, which confirmed a metastatic adenocarcinoma.

On October 23, 2017, Patricia conferred with a surgeon regarding possible treatment of the metastasized cancer, but was advised that surgery was no longer a viable option. Patricia died in February 2018.

## B. COMPLAINT AND ALLEGATIONS OF MALPRACTICE

On May 24, 2019, the Estate filed a medical malpractice complaint against HMC and Dr. Alsawah. Count I alleged negligence by Dr. Alsawah. The Estate maintained that Dr. Alsawah breached the standard of care by failing to "[e]valuate and/or investigate the cause of [Patricia's] increasing CEA levels[,]" by failing to "[w]ork up the patient to rule out the presence of metastatic

disease[,]" and by committing "[o]ther acts and/or omissions to be determined throughout the course of discovery." The Estate also alleged:

34. As a direct and proximate result of the aforementioned violations of the standard of care by Dr. Alsawah, there was a delay in the diagnosis of Patricia Benigni's metastatic disease.

35. As a result of the delay in diagnosis, there was an advancement in the disease process resulting in the formation and metastatic lesions in the liver and adrenal glands.

36. That an earlier diagnosis of the disease would have given Patricia Benigni a better prognosis, including increased survival or cure.

In Count II of the complaint, the Estate alleged vicarious liability with respect to HMC.

The Estate attached an affidavit of merit by Dr. Gordon to the complaint. He averred that "[a]n earlier diagnosis of the disease would have given Patricia Benigni a better prognosis, including survival." Dr. Gordon further stated:

If the appropriate workup and evaluation would have been followed up on, it would have evidenced the disease process and would have placed Patricia Benigni in a much more favorable category for a successful treatment outcome, and if not cure, then for long-term survival.

Dr. Gordon asserted that with Patricia's rising CEA level in 2015, Dr. Alsawah breached the standard of care by relying solely on the CT scans, physical examinations, and other blood work. According to Dr. Gordon, a PET scan, which provides a "better yield" than a CT scan, should have been ordered. Dr. Alsawah in 2015 should also have ordered magnetic resonance imaging (an MRI), a scope, and a biopsy to explore the cause of the elevated CEA levels.

Dr. Gordon testified that for a patient diagnosed with stage III colorectal cancer in 2012, such as Patricia, the survival rate was 75% to 85%. He noted that it is common for colorectal cancer to metastasize to the liver. He stated that "when these cancers get to the liver, the disease course can pick up and become rapid." Dr. Gordon's deposition testimony was consistent with his affidavit, though much of the deposition focused on identifying statistical rates of survival of stage IV colorectal cancer.

Dr. Gordon provided a separate affidavit during summary disposition proceedings. Dr. Gordon reiterated the points that he had made in his affidavit of merit. He averred that "[a]n earlier diagnosis would have given [Patricia] a better prognosis, including survival." Dr. Gordon further averred that it was his "opinion that appropriate workup and evaluation would have evidenced the disease process and would have placed [Patricia] in a much more favorable category for a successful treatment outcome, for long-term survival, if not cure." He indicated that he was familiar with data maintained by the National Cancer Institute and its Surveillance, Epidemiology, and End Results (SEER) Program, as well as data maintained by the America Joint Committee on Cancer. Dr. Gordon emphasized that further investigation by Dr. Alsawah was imperative to identify the cause of Patricia's rising CEA level. According to Dr. Gordon, the medical literature,

which was attached to his affidavit and referenced in his deposition, reflected that the "detection of recurrences at an earlier stage is associated with a higher rate of curative treatment." Dr. Gordon additionally averred:

> 7. It is my opinion that proper investigation of the cause of the rising CEA levels would have evidenced the metastatic disease as early as November of 2015. It is further my opinion that if the liver metastasis was diagnosed in November 2015, rather than in 2017, it is more likely [Patricia] would have had an option for curative-intent surgery, as well as additional treatment modalities. These modalities would have provided an opportunity to achieve a better result, including survival. My opinion that these modalities, including curative-intent surgery, would have provided such an opportunity is based on published medical literature.

> 8. This literature indicates, in surgical case series, five-year overall survival rates following surgical resection of metastatic colorectal cancer to the liver range from 24 to 58 percent.

## C. MOTION FOR SUMMARY DISPOSITION AND THE TRIAL COURT'S RULING

In February 2021, defendants moved for summary disposition under MCR 2.116(C)(10). Defendants' argument focused on the second sentence of MCL 600.2912a(2) and the loss-of-opportunity doctrine. They argued that there was no scientifically reliable information demonstrating that Patricia's opportunity to survive was ever greater than 50% or that her opportunity to survive was diminished by 50%. Defendants argued that the literature in the cancer-treatment community unequivocally established that Patricia's opportunity to survive the metastatic colon cancer was not reduced by greater than 50% as a result of the alleged delay in diagnosing the metastasis. Alternatively, defendants requested a hearing under *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

In response, the Estate maintained that defendants ignored the spirit of the lost-opportunity doctrine under MCL 600.2912a(2), which was enacted to allow for the recovery of the loss of an opportunity to survive and not merely the initial opportunity to survive. The Estate argued that it had demonstrated that if Dr. Alsawah had properly evaluated the cause of Patricia's "rising CEA levels and diagnosed her metastatic cancer earlier, curative treatment options, including surgical resection, would have increased her opportunity to survive or to achieve a better result by more than the threshold required by MCL 600.2912a(2)."

The trial court held a hearing on defendants' motion for summary disposition and later issued a written opinion and order granting the motion. The trial court noted that the parties agreed that the analysis was controlled by this Court's decision in *Fulton v William Beaumont Hosp*, 253 Mich App 70, 84, 655 NW2d 569 (2002), and thus accepted that this case is a lost opportunity case. Relying on the parties' arguments, the trial court framed the issue as "whether an alleged delayed diagnosis of [Patricia's] metastatic cancer decreased her opportunity to survive by more than 50%." The trial court concluded that there was no evidence that Patricia's opportunity to survive was reduced by 50% as a result of Dr. Alsawah's alleged malpractice and granted summary disposition as a result. The Estate now appeals to this Court.

-4-

## II. DISCUSSION

### A. TRADITIONAL MEDICAL MALPRACTICE VERSUS A LOST OPPORTUNITY CLAIM

Contrary to the statement of the case by both parties and the trial court, the facts of this case present a claim for traditional medical malpractice, not one for loss-of-opportunity to survive or achieve a better result.[1]

The statute at the heart of this case is MCL 600.2912a(2), which provides:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.

Section 2912a(2) sets forth the proximate cause requirements in medical malpractice claims. The first sentence deals with claims of traditional malpractice, where proximate cause is established by a showing that the defendant's negligence more probably than not caused the plaintiff's injuries.

The second sentence of the statute "addresses a subcategory of injuries in medical malpractice litigation governed by the loss-of-opportunity doctrine." *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485, 495; 791 NW2d 853, 857 (2010). The doctrine is not defined in the statute but has been recognized in Michigan common law to apply to cases where the plaintiff suffers a loss of an opportunity to survive or achieve a better result. In *Fulton*, this Court held that, in order to satisfy the second sentence of § 2912a(2), a plaintiff must show that the defendant's malpractice resulted in a loss of opportunity greater than 50 percentage points. *Fulton*, 253 Mich App at 84.

The parties and the trial court have focused their arguments on whether Patricia lost an opportunity to survive greater than 50 percent. These arguments, however, are inapposite. Based on Supreme Court precedent, this case does not present a claim for loss-of-opportunity to achieve a better result. Analyzing facts analogous to this case, the majority of our Supreme Court in *O'Neal* held that *Fulton* was a traditional malpractice case and had been erroneously characterized as one for loss-of-opportunity by this Court. Following the Supreme Court's analysis in *O'Neal*, we conclude that this case presents a claim for traditional malpractice only.

The facts of *Fulton* are very similar to the circumstances in this case. *Fulton* involved a claim for the failure to timely diagnose cervical cancer. The decedent's estate alleged that if

---

[1] This Court reviews de novo a trial court's ruling on a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). We also review de novo questions concerning the interpretation and application of a statute. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

decedent's cancer had been diagnosed earlier, she would have had treatment options available that could have saved her life. The theory, much like the Estate's theory in this case, was that the decedent was not diagnosed until her cancer was untreatable and, as a consequence, she died.

In *O'Neal*, a majority of the Supreme Court agreed that *Fulton* had been mischaracterized as a lost opportunity case. Writing the lead opinion, Justice Hathaway, joined by Justice Weaver, recognized that *Fulton* presented a case for traditional malpractice: "Because the Court of Appeals in this case relied on *Fulton*, which erroneously applied the second sentence [of MCL 600.2912a(b)(2)] to a traditional malpractice case, we review *Fulton* and determine what, if any, continuing validity it has." *O'Neal*, 487 Mich at 498. Justice Cavanagh wrote a concurring statement, signed by Justice Kelly, that likewise recognized that *Fulton* presented a case for traditional malpractice. *Id*. at 507 (Cavanagh, J., concurring). He further opined that *Fulton* should be overruled "to the extent that courts have relied on it to improperly transform what could be traditional medical malpractice claims into loss-of-opportunity claims." *Id*. In keeping with the Supreme Court precedent, we conclude that this case presents a claim for traditional malpractice.

Our court has consistently looked to the gravamen of the pleaded facts to discern whether a case presents a traditional malpractice or loss-of-opportunity claim. For example, in *Taylor v Kent Radiology*, 286 Mich App 490, 498; 780 NW2d 900 (2009), the plaintiffs sued a radiologist for failing to diagnose a talus fracture when interpreting the plaintiff patient's x-rays, resulting in an otherwise unnecessary surgery, avascular necrosis, and arthritis. The *Taylor* panel rejected the defendants' argument that the plaintiffs' action was one for lost opportunity. This Court concluded that, based on the complaint, trial brief, and statements at trial, it was clear that plaintiffs' case was a traditional medical malpractice suit. *Id.* at 509. This Court observed that whether the second sentence of MCL 600.2912a(2) applies in a given case depends on the nature of the claims. *Id.* at 506. See also *Velez v Tuma*, 283 Mich App 396, 397; 770 NW2d 89 (2009), rev'd in part on other grounds by 492 Mich 1 (2012).

In this case, it is undisputed that Patricia died as a result of the metastasized colorectal cancer which, undiagnosed, progressed to the point that there was no curative surgical option available. It is also alleged that Dr. Alsawah's failure to properly investigate the elevated CEA levels and catch the recurrence of cancer sooner was the cause of the disease progressing to this level. An earlier diagnosis would have given Patricia the option for curative surgery and increased her chance of a cure and survival. Because Patricia died as a result of the alleged negligence in delayed diagnosis, this is a claim for traditional malpractice, not one for loss-of-opportunity.

## B. PROXIMATE CAUSATION

Given that this case involves traditional malpractice, we next consider the Estate's burden regarding proximate causation.

"The plaintiff in a medical malpractice action bears the burden of proving: (1) the applicable standard of care, (2) breach of that standard by defendant, (3) injury, and (4) proximate causation between the alleged breach and the injury." *Cox v Bd of Hosp Managers for the City of Flint*, 467 Mich 1, 10; 651 NW2d 356 (2002) (quotation marks and citation omitted). Failure to establish any one of these four elements is fatal to a plaintiff's medical malpractice suit. *Id.*

As discussed above, proximate cause in a traditional medical malpractice case is statutorily addressed in the first sentence of MCL 600.2912a(2), which provides: "In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants."

In *Ykimoff v Foote Mem Hosp*, 285 Mich App 80, 87; 776 NW2d 114 (2009), this Court defined the parameters of the term "proximate cause," explaining

> "Proximate cause" is a term of art that encompasses both cause in fact and legal cause. Generally, an act or omission is a cause in fact of an injury only if the injury could not have occurred without (or but for) that act or omission. Cause in fact may be established by circumstantial evidence, but the circumstantial evidence must not be speculative and must support a reasonable inference of causation. All that is necessary is that the proof amount to a reasonable likelihood of probability rather than a possibility. The evidence need not negate all other possible causes, but such evidence must exclude other reasonable hypotheses with a fair amount of certainty. Summary disposition is not appropriate when the plaintiff offers evidence that shows that it is more likely than not that, but for defendant's conduct, a different result would have been obtained. [Quotation marks and citations omitted.]

"[L]egal causation relates to the foreseeability of the consequences of the defendant's conduct[.]" *O'Neal,* 487 Mich at 496. "[P]roximate causation in a malpractice claim is treated no differently than in an ordinary negligence claim, and it is well-established that there can be more than one proximate cause contributing to an injury." *Id*. at 496-497. "[T]he proper standard for proximate causation in a negligence action is that the negligence must be 'a proximate cause' not 'the proximate cause.' " *Id*. at 497.

Because the parties and the trial court incorrectly framed this case as one involving lost opportunity, there has been no briefing or analysis regarding traditional malpractice causation. We conclude that the issue should first be addressed by the trial court.

## III.  CONCLUSION

Because Patricia actually suffered an adverse result (in this case death), this is a traditional medical malpractice case, not one for lost opportunity. We therefore reverse the trial court order granting summary disposition and remand this case to the trial court to determine whether there is a question of material fact as to proximate causation under traditional malpractice principles. If so, the issue is one for the jury. If not, the Court shall make the determination. We do not retain jurisdiction.

/s/ Sima G. Patel
/s/ Douglas B. Shapiro