*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

MICHAEL BENIGNI, Personal Representative of the ESTATE OF PATRICIA BENIGNI,

FOR PUBLICATION
September 8, 2022

Plaintiff-Appellant,

v

No. 357033
St. Clair Circuit Court
LC No. 19-001198-NH

SAMIR ALSAWAH, M.D., and HURON MEDICAL CENTER, PC,

Defendants-Appellees.

Before: MARKEY, P.J., and SHAPIRO and PATEL, JJ.

MARKEY, P.J. *(dissenting).*

I respectfully dissent. Plaintiff, Michael Benigni, as the Personal Representative of the Estate of Patricia Benigni, appeals by right the trial court's order granting summary disposition in favor of defendants, Samir Alsawah, M.D., and Huron Medical Center, PC (HMC), in this medical malpractice action. The decedent, Patricia Benigni,[1] died from metastatic colorectal cancer. Plaintiff contended that Dr. Alsawah failed to timely diagnose the metastasized cancer that had spread to Patricia's liver and possibly her adrenal glands and that Dr. Alsawah improperly investigated and evaluated Patricia's dramatically-increasing carcinoembryonic antigen (CEA) level as revealed by regular testing during years of cancer surveillance following resection of the original tumor. Plaintiff's theory was that the rising CEA level suggested metastasis of the cancer and that had Dr. Alsawah adequately explored that possibility the metastasis would have been discovered and treated a couple of years before the actual date of diagnosis, at which later date surgery was only "technically feasible" and not pursued. This appeal focuses on the application of MCL 600.2912a(2), which provides, in pertinent part, that "[i]n an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%." Judicial construction of this provision has a tortured history in Michigan civil jurisprudence. In *Fulton v William Beaumont Hosp*, 253 Mich App 70; 655 NW2d 569 (2002), overruled in part by *O'Neal v St John Hosp & Med Ctr*, 487 Mich 485; 791 NW2d 853 (2010), this Court applied a percentage-point-differential

---

[1] Patricia was plaintiff's wife.

-1-

formula—subtracting the statistical chance of survivability given the malpractice from the statistical chance of survivability absent any malpractice—in determining whether the lost opportunity to survive was greater than 50% under MCL 600.2912a(2). In *O'Neal*, a majority of justices of the Michigan Supreme Court did not agree with *Fulton*'s percentage-point-differential formula *when applied to a traditional medical malpractice claim to assess causation*. As explained in detail below, I believe that we remain bound by *Fulton* for purposes of a true loss-of-opportunity claim, but I implore our Supreme Court to, at first chance, provide some much-needed clarification regarding the proper construction of the lost-opportunity provision in MCL 600.2912a(2). In the case before us, I conclude on the basis of the documentary evidence that plaintiff's suit is ultimately too speculative and that there is no genuine issue of material fact that Patricia's lost opportunity to survive was not greater than 50%. I disagree with my colleagues that this case is not a lost-opportunity suit, although the muddled caselaw makes that determination difficult to assess. Moreover, plaintiff has waived any right to pursue this case as a traditional medical malpractice action. Accordingly, I would affirm the trial court's ruling.

## I. BACKGROUND

### A. OVERVIEW OF MEDICAL HISTORY AND EVENTS

Patricia had a medical history that included hypertension, diabetes, hyperlipidemia, and a benign brain tumor that resulted in a left temporal craniotomy in 2005. She had a stroke shortly after the tumor was removed, which left her with various deficits. Patricia also suffered seizures after the stroke. In 2012, Patricia was diagnosed with stage III colorectal cancer. She was referred to HMC and Dr. Alsawah, a board-certified medical oncologist, in November 2012. Patricia received neoadjuvant chemotherapy and radiation treatment in preparation for surgery. Subsequently, a resection to remove the tumor was performed in February 2013. From March to September 2013, Patricia received nine rounds of adjuvant chemotherapy to lower the risk of recurrence and to address lymph node concerns. Throughout 2013, Dr. Alsawah checked and monitored Patricia's CEA level approximately every four to six weeks, with the level ranging from 1.6 to 4.4 nanograms per milliliter of blood (ng/mL) in nine separate tests.[2] An abdominal and pelvic computerized tomography (CT) scan in 2013 did not reveal recurrence or spread of the cancer.

In 2014, Dr. Alsawah saw Patricia in his office approximately every three months. In March 2014, Patricia's CEA level was checked, and it measured 4.5 ng/mL. This was the only CEA test performed in 2014. A colonoscopy and CT scan performed in 2014 showed no signs of recurrence or metastasis of the cancer. Patricia's CEA level was 8.3 ng/mL in January 2015 and rose to 24.2 ng/mL in April 2015. In November 2015, her CEA level had once again risen, testing at 38.6 ng/mL. A CT scan performed in 2015 was normal, reflecting no recurrence or spread of the cancer. Dr. Alsawah continued to see Patricia on a regular basis. Patricia had a CEA level of 59.3 ng/mL in May 2016. A CT scan and colonoscopy performed in 2016 did not indicate recurrence or metastasis of the cancer. When Patricia saw Dr. Alsawah on August 23, 2016, he

---

[2] I discuss below the evidence regarding CEA levels and their meaning.

again tested her CEA level, which measured 78.5 ng/mL. She also complained of fatigue.[3]  Dr. Alsawah now began scheduling Patricia for visits every six months.

In February 2017, Patricia's CEA level was 175.9 ng/mL.  In August 2017, her CEA level measured 459 ng/mL, and Patricia complained of weakness and fatigue.  A CT scan performed in August 2017 revealed a large liver mass suspicious of metastasis with possible involvement of the adrenal glands.  There was no apparent indication of tumor recurrence at the original surgical site.  A positron emission tomography (PET) scan also showed a large hepatic mass and additionally gave rise to cancer concerns regarding the right adrenal gland.  Patricia had a liver biopsy on October 9, 2017, which confirmed a metastatic adenocarcinoma.

On October 23, 2017, Patricia conferred with Dr. Vandad Raofi, a surgeon, regarding possible treatment of the metastasized cancer.[4]  With respect to an assessment and plan, Dr. Raofi wrote:

> Ms. Benigni is a 68-year-old lady who has biopsy-proven metastatic lesion to the liver. Unfortunately the location of the lesion would require major resection in the form of a trisegmentectomy. While this is technically feasible, our concern is the patient's overall performance status which can significantly affect her recovery from major hepatic surgery. Furthermore there is concern for metastatic disease to the adrenal gland. Even though the adrenal gland can also be surgically removed, once there is presence of hematogenous spread in two different visceral organs, the overall prognosis is inferior than that for metastatic liver disease only. These findings were discussed with the patient and husband in detail. We did also review the films with Dr. Lai from radiology [and] the right adrenal gland is amenable to percutaneous biopsy. Therefore prior to making any final surgical

---

[3] Patricia's medical history over the years following the 2013 surgery, which ostensibly was unrelated to her cancer surveillance, included some injuries from a couple of falls, gait disturbances, vision diminishment, neurological decline, depression, and mild cognitive impairment.

[4] In reviewing the circumstances surrounding Patricia's visit, Dr. Raofi noted in a report:

> With regards to her colorectal cancer, despite elevated CEA levels, the patient had negative imagings until recently. However recent imaging shows a large mass in the right lobe and left medial section of the liver. There is also enlargement of both adrenal glands concerning for metastatic disease, with the right being worse than the left.

Dr. Raofi also indicated that a "[r]ecent MRI . . . shows a very large mass in the right lobe of the liver and extending into the left medial segment[,]" and "[t]here is also significant enlargement of the right adrenal gland suspicious for metastatic disease."

recommendations, we will schedule the patient for biopsy of the right adrenal gland and contact her once the results are available.

Patricia chose not to have surgery or any more treatment, and she died in February 2018.

## B. THE COMPLAINT

On May 24, 2019, plaintiff filed a medical malpractice complaint against HMC and Dr. Alsawah. Count I alleged negligence by Dr. Alsawah. Plaintiff maintained that Dr. Alsawah breached the standard of care by failing to "[e]valuate and/or investigate the cause of [Patricia's] increasing CEA levels[,]" by failing to "[w]ork up the patient to rule out the presence of metastatic disease[,]" and by committing "[o]ther acts and/or omissions to be determined throughout the course of discovery." Plaintiff also alleged:

34. As a direct and proximate result of the aforementioned violations of the standard of care by Dr. Alsawah, there was a delay in the diagnosis of Patricia Benigni's metastatic disease.

35. As a result of the delay in diagnosis, there was an advancement in the disease process resulting in the formation and metastatic lesions in the liver and adrenal glands.

36. That an earlier diagnosis of the disease would have given Patricia Benigni a better prognosis, including increased survival or cure.

In Count II of the complaint, plaintiff alleged vicarious liability with respect to HMC, contending that "Dr. Alsawah was an employee, ostensible agent, apparent agent, or actual agent of" HMC.

Plaintiff attached to the complaint an affidavit of merit by Dr. Jeffrey Gordon, a board-certified medical oncologist and hematologist. He averred that "[a]n earlier diagnosis of the disease would have given Patricia Benigni a better prognosis, including survival." Dr. Gordon further stated:

If the appropriate workup and evaluation would have been followed up on, it would have evidenced the disease process and would have placed Patricia Benigni in a much more favorable category for a successful treatment outcome, and if not cure, then for long-term survival.

Defendants filed an answer, mostly neither admitting nor denying the factual allegations in plaintiff's complaint, along with denying any liability. Defendants supported their answer with an affidavit of meritorious defense by Dr. Joel Appel.

## C. DISCOVERY

### 1. DEPOSITION TESTIMONY OF DR. ALSAWAH

Dr. Alsawah testified that the "cure" rate for stage III colorectal cancer is 60% and that 40% of patients suffer a relapse, which includes metastasis of the cancer, within the first five years.

The doctor indicated that cancer surveillance to check for possible metastasis involves (1) regular physical examinations that entail, in part, palpation to check for organ enlargement, (2) annual abdominal and pelvic CT scans, (3) annual CEA testing,[5] and (4) complete blood count (CBC) and metabolic panel testing. Dr. Alsawah opined that physical examinations are the most important component of cancer surveillance. With respect to CEA levels, the doctor testified that the normal range is 0 to 5 ng/mL, that there typically are variations in CEA levels from test to test, and that the focus is on any upward trends in a patient's CEA level. Dr. Alsawah described upward trends above 5 ng/mL as concerning and alarming.

Dr. Alsawah testified that Patricia's "performance status"[6] had declined in 2014, but he observed that this was likely due to her other physical and mental ailments and not suggestive of metastasis, especially upon consideration of a negative CT scan and normal CEA test in 2014. Dr. Alsawah explained that when Patricia's CEA level jumped to 8.2 ng/mL in January 2015 and then to 24.2 ng/mL in April 2015, he became concerned and found it necessary to monitor her more closely through checkups every three months. Dr. Alsawah saw Patricia in July 2015, and while no CEA test was performed at the time, a CT scan was ordered, and it did not reveal any recurrence or metastasis of the cancer. As Patricia's CEA level continued to rise in November 2015 and through 2016, Dr. Alsawah, although concerned, relied on the CT scans and other tools that continued to show no return of the cancer. Dr. Alsawah testified that there are "many benign causes" that can produce a rise in a person's CEA level and that a CEA test is "very nonspecific and not sensitive enough." Dr. Alsawah further noted that "the CEA is a very nonreliable study," that CEA testing is just one of several tools used in cancer surveillance, and that physical examinations and CT scans "are way more important to [him] than a CEA." The doctor noted that Patricia's performance status continued to decline in 2016, but it appeared related to health issues other than cancer.

With respect to Patricia's CEA level of 78.5 ng/mL in August 2016, Dr. Alsawah testified that it remained concerning, but because every other indicator, including a CT scan and physical examination, did not suggest the presence of cancer, he began scheduling Patricia for visits every six months. At the time of the CT scan in August 2017, which revealed the presence of cancer in Patricia's liver, Dr. Alsawah still could not detect a mass on physical palpation of the liver. Dr. Alsawah indicated that he did not know whether the metastasis would have been discovered earlier had a PET scan been performed. He acknowledged in "retrospect" that the spread of the cancer to Patricia's liver had caused the upward trend in her CEA level.

## 2. AFFIDAVIT OF DR. PHILIP A. PHILIP AND SUPPORTING LITERATURE

---

[5] Dr. Alsawah noted that Patricia's CEA level was checked nine times in 2013 because it is common to do the testing when a patient comes in for a visit and Patricia came in for nine rounds of chemotherapy in 2013 following the resection. He noted that chemotherapy does not impact CEA levels.

[6] A patient's "performance status" is a score that measures the patient's ability to perform the activities of daily living.

Dr. Philip A. Philip, a board-certified medical oncologist, executed an affidavit on behalf of defendants. Dr. Philip averred that he had reviewed the complaint and understood that plaintiff alleged a negligent delay in the diagnosis of Patricia's metastatic disease and claimed that an earlier diagnosis would have given her a better prognosis, including an increased chance of survival. He indicated that he was familiar with survival statistics for metastatic colorectal cancer. Dr. Philip stated that data maintained by the National Cancer Institute (NCI) and the Surveillance, Epidemiology, and End Results (SEER) Program revealed that the 2015 survival rate for metastatic colorectal cancer was less than 20%. Additionally, according to Dr. Philip, data maintained by the American Joint Commission on Cancer (AJCC) showed that the 2015 survival rate for metastatic colorectal cancer was less than 20%. Attached to Dr. Philip's affidavit were supporting documents from the SEER Program and the AJCC.[7] Finally, Dr. Philip averred that Patricia's opportunity to survive the cancer "was never greater than fifty percent" and that her opportunity to survive was not diminished by greater than 50% as a result of the alleged failure to detect the metastasized cancer in 2015.

### 3. DEPOSITION TESTIMONY OF DR. GORDON

In his deposition, Dr. Gordon testified that he reviewed three articles in medical journals regarding CEA levels, including an article in the Journal of the National Comprehensive Cancer Network (JNCCN). Dr. Gordon stated that according to the JNCCN article and the cases examined therein, a CEA level above 15 ng/mL rarely reflected a false indicator of colorectal cancer. And, according to Dr. Gordon, if the CEA level was over 35 ng/mL, "it was always associated with a recurrence of colorectal cancer."[8] The doctor opined that in November 2015 when Patricia's CEA level was 38.6 ng/mL, there was a likelihood that her cancer had metastasized to the liver. Dr. Gordon asserted that with Patricia's rising CEA level in 2015, Dr. Alsawah breached the standard of care by relying solely on the CT scans, physical examinations, and other blood work. According to Dr. Gordon, a PET scan, which provides a "better yield" than a CT scan, should have been ordered. Referencing an article in The Oncologist, Dr. Gordon explained that with respect to asymptomatic patients with rising CEA levels who indeed have a recurrence of colorectal cancer, CT scans do not readily reveal the recurrence and PET scans are "more likely" to show the cancer. Other avenues that should have been considered or explored by Dr. Alsawah in 2015 included magnetic resonance imaging (an MRI), a scope, and a biopsy.

---

[7] The documents contain statistics regarding five-year survival rates, which ranged from 14% to 16% for patients with metastasized colorectal cancer, including cancer that had spread to the liver.

[8] The authors themselves concluded:

> [A] repeated and confirmed serum CEA level greater than 15 ng/mL is strongly predictive of disease recurrence, and a confirmed serum CEA level greater than 35 ng/mL seems to be virtually diagnostic of the presence of cancer. [12 JNCCN 6, *False-Positive Elevations of Carcinoembryonic Antigen in Patients with a History of Resected Colorectal Cancer*, p 913 (2014).]

Defense counsel asked Dr. Gordon about the statistical likelihood of survival under the circumstances facing Patricia in 2017 when the metastasis was discovered. The doctor answered:

> Again, it depends upon exactly what is the presentation, but someone who is presenting with a large mass in the liver with multiple other masses in the liver, what looks to have both adrenal glands involved, and a performance status that is not good, the survival would have been considered less than a year.

When queried whether he meant that almost 100% of patients in such circumstances would not survive, Dr. Gordon responded:

> If they have a big large mass in the liver, multiple other masses in the liver, and disease in the adrenal gland and their medical condition is poor, they tend not to [survive] because they don't tend to get treatment or tolerate treatment.

Dr. Gordon also agreed that in regard to patients with stage IV (metastasized) colorectal cancer in 2017, less than half of them would be alive five years later.

Dr. Gordon indicated that with respect to a patient diagnosed in 2012 with stage III colorectal cancer, such as Patricia, the survival rate was 75% to 85%. The doctor noted that it is common for colorectal cancer to metastasize to the liver. He stated that "when these cancers get to the liver, the disease course can pick up and become rapid." Dr. Gordon did not think that Patricia had metastatic disease all along. He did believe, however, that it was likely that there remained microscopic disease in the area of the rectum following surgery and adjuvant chemotherapy. When pressed by counsel to provide the timeframe when the cancer first arrived in the liver, Dr. Gordon answered "that it is more likely than otherwise that it got to the liver around th[e] time that [the] CEA of 38 was obtained." This would have been in November 2015. He could not state with 100% certainty that metastasis of the liver would have been found at that time, but more than likely the cancer was present by November 2015.

Dr. Gordon was asked to identify the treatment options available in November 2015 had a PET scan been performed and the cancer been detected in Patricia's liver. The doctor testified that any options were dependent on the specific location and size of the cancer and the extent that Patricia could tolerate treatment. When repeatedly asked about survival statistics or the five-year survival rate relative to a person diagnosed in 2015 with stage IV colorectal cancer, with metastasis to the liver, Dr. Gordon responded that the answer depended on a number of variables, the overall situation, and new treatment technologies and advancements that became available right after 2015 that could have been utilized; he could not provide a specific answer to the question.

When questioned whether it was accurate to state that Patricia would not have survived if she had been diagnosed with stage IV colorectal cancer in November 2015, Dr. Gordon responded:

> If she was stage 4, it would have been more likely at some point during her life she would have died even if they had attempted curative-intent surgery. But because the curative-intent surgery doesn't cure 100 percent of people, unfortunately, so statistically there would still be that risk that other areas might

have popped up. Nevertheless, at some point it could have been that she could have passed away later from cancer.

Dr. Gordon was asked about statistics that showed that the 2015 survival rate for metastatic colorectal cancer was less than 20%. The doctor viewed that percentage as "a general blanket statistic, that's not necessarily looking at certain ways that people present with stage 4[.]" Dr. Gordon reiterated that you cannot simply accept the statistical percentage emphasized by defendants because "you have to look at the type of stage 4 you're dealing with" and because survival assessment "depends upon if someone has presented with disease in the liver that you feel you can attempt curative-intent surgery." Prefaced by defense counsel's assumption that Dr. Gordon was correct that the cancer had metastasized to Patricia's liver by November 2015 given her CEA level and that it should have been diagnosed at that time, counsel asked the doctor what Patricia's chance of survival was at that point. Dr. Gordon answered:

> I can't give a specific number to it. All I can say is that there was a missed opportunity to have looked into seeing what was going on with the cancer, and if it was in the liver, would there have been potentially an opportunity to do something with curative intent or look into other types of treatment to extend survival otherwise.

## 4. AFFIDAVIT OF DR. GORDON

Dr. Gordon, along with executing the affidavit of merit and being deposed, provided a separate affidavit for purposes of plaintiff's response to defendants' motion for summary disposition. Dr. Gordon reiterated the points that he had made in his affidavit of merit. He averred that "[a]n earlier diagnosis would have given [Patricia] a better prognosis, including survival." Dr. Gordon further averred that it was his "opinion that appropriate workup and evaluation would have evidenced the disease process and would have placed [Patricia] in a much more favorable category for a successful treatment outcome, for long-term survival, if not cure." He indicated that he was familiar with data maintained by the NCI and the SEER Program, as well as data maintained by the AJCC. Dr. Gordon emphasized that further investigation by Dr. Alsawah was imperative to identify the cause of Patricia's rising CEA level. According to Dr. Gordon, the medical literature, which was attached to his affidavit and referenced in his deposition, reflected that the "detection of recurrences at an earlier stage is associated with a higher rate of curative treatment." Dr. Gordon additionally averred:

> 7. It is my opinion that proper investigation of the cause of the rising CEA levels would have evidenced the metastatic disease as early as November of 2015. It is further my opinion that if the liver metastasis was diagnosed in November 2015, rather than in 2017, it is more likely [Patricia] would have had an option for curative-intent surgery, as well as additional treatment modalities. These modalities would have provided an opportunity to achieve a better result, including survival. My opinion that these modalities, including curative-intent surgery, would have provided such an opportunity is based on published medical literature.

8. This literature indicates, in surgical case series, five-year overall survival rates following surgical resection of metastatic colorectal cancer to the liver range from 24 to 58 percent.

I note that paragraph or averment 8 of the affidavit setting forth actual percentages comes from an article on UpToDate, an electronic clinical resource tool, entitled "Management of potentially resectable colorectal cancer liver metastases." In relevant part, on page 3 of the article, the authors wrote:

> Resection offers the greatest likelihood of cure for patients with liver-isolated CRC [colorectal cancer]. In surgical case series, five-year survival rates after resection range from 24 to 58 percent, averaging 40 percent . . ., and surgical mortality rates are generally [under] 5 percent. Subgroups with advanced age, comorbid disease, and synchronous hepatic and colon resection may have higher procedure-related mortality and worse long-term outcomes. . . . .

> Long-term, a proportion of patients undergoing hepatic metastasectomy may have long-term relapse-free survival and may be cured. . . . .

> Because of its clear survival impact, surgical resection is the treatment of choice when feasible. The percentage of patients with isolated hepatic metastases who are amenable to potentially curative resection has been a bit of a moving target, since the boundaries of "resectable" have expanded in recent years. It is safe to say that a majority of patients with metastatic disease are not potentially curative surgical candidates because of tumor size, location, multifocality, or inadequate hepatic reserve. Ten to 20 percent of those patients with initially unresectable liver metastases may be converted to resectable with neoadjuvant chemotherapy. The appropriate treatment for the balance of individuals is palliative chemotherapy.

D. MOTION FOR SUMMARY DISPOSITION AND THE TRIAL COURT'S RULING

In February 2021, nearly two years after the complaint was filed and following discovery, defendants moved for summary disposition under MCR 2.116(C)(10). Focusing on MCL 600.2912a(2), defendants argued that there was no scientifically-reliable information demonstrating that Patricia's opportunity to survive was ever greater than 50% or that her opportunity to survive was diminished by 50%. Defendants contended that the widely-accepted literature in the cancer-treatment community unequivocally established that Patricia's opportunity to survive the metastatic colon cancer was not reduced by greater than 50% as a result of the alleged delay in diagnosing the metastasis. On the possibility that the trial court would require more information on the matter, defendants alternatively requested a hearing under *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

In response, plaintiff maintained that defendants ignored the spirit of the lost-opportunity doctrine under MCL 600.2912a(2), which was enacted to allow for the recovery of the loss of an opportunity to survive and not merely the initial opportunity to survive. Plaintiff argued that he had demonstrated that if defendants had properly evaluated the cause of Patricia's "rising CEA levels and diagnosed her metastatic cancer earlier, curative treatment options, including surgical

resection, would have increased her opportunity to survive or to achieve a better result by more than the threshold required by MCL 600.2912a(2)."

On March 15, 2021, the trial court held a hearing on defendants' motion for summary disposition and took the matter under advisement. On April 12, 2021, the trial court issued a written opinion and order granting the motion. The court noted that the parties agreed that the analysis was controlled by this Court's decision in *Fulton*, 253 Mich App 70. *Fulton* held, as paraphrased or characterized by the trial court, "that the plaintiff only had to show that his opportunity to survive had been reduced by a number greater than 50% due to [the] defendant's negligence regardless of what [the] plaintiff's initial opportunity to survive was." Accordingly, the trial court framed the issue in this case as being "whether an alleged delayed diagnosis of [Patricia's] metastatic cancer decreased her opportunity to survive by more than 50%." After acknowledging the parties' arguments and examining the documentary evidence, the trial court concluded that there was no evidence that Patricia's opportunity to survive was reduced by 50% as a result of Dr. Alsawah's alleged malpractice. The trial court found that plaintiff's argument that Patricia would have had a better opportunity for surgery in 2015 as compared to 2017 was entirely speculative considering that the state of her cancer in 2015 was effectively unknown. The court determined that a jury would have no ability to assess whether Patricia suffered a lost opportunity to survive that was greater than 50%. Plaintiff now appeals to this Court.

## II. ANALYSIS

### A. APPELLATE ARGUMENTS

On appeal, plaintiff argues that the trial court erred by concluding that there was insufficient evidence to create a genuine issue of material fact regarding whether Patricia had suffered a lost opportunity to survive that was greater than 50%. Plaintiff contends that there was evidence—Dr. Gordon's deposition testimony and affidavit—showing that Patricia was a candidate for a liver resection in 2015 but not in 2017 and that a jury should assess whether the greater-than-50% threshold was satisfied. Plaintiff further maintains that although the parties appear to agree on the method of calculating a lost opportunity to survive under MCL 600.2912a(2) through application of the *Fulton* panel's construction of the statute, this Court should reexamine *Fulton*. Plaintiff also asserts that Patricia's initial opportunity to survive in 2015 did not have to exceed 50%. Finally, plaintiff argues that MCL 600.2912a(2) does not require a 50-plus percentage-*point* diminishment in the opportunity to survive; rather, the reduction must simply be by 50-plus percent. According to plaintiff, 50 percentage points is not the same as 50%.

Defendants contend that plaintiff makes no attempt to show that his evidence actually satisfied the requirement in MCL 600.2912a(2) that the lost opportunity to survive was greater than 50%. Defendants claim that the accepted medical literature demonstrates that the survival rate for stage IV colorectal cancer with metastasis to the liver was less than 20% and that there was no evidence that the survival rate was greater in 2015 than in 2017. Defendants assert that Dr. Philip's affidavit was unrefuted. Defendants further maintain that Dr. Gordon essentially refused to provide 2015 survival statistics of persons with colorectal cancer that had spread to the liver. Defendants also argue that to the extent that Dr. Gordon's affidavit contradicted his deposition testimony, it should be disregarded. And even if the affidavit is considered, it did not establish that Patricia's lost opportunity to survive was greater than 50%. Defendants additionally

argue that the averments in the affidavit were unreliable. Finally, defendants contend that plaintiff's argument that Patricia was a candidate for resection in 2015 simply does not demonstrate a lost opportunity to survive.

## B. STANDARD OF REVIEW

This Court reviews de novo a trial court's ruling on a motion for summary disposition. *El-Khalil v Oakwood Healthcare, Inc*, 504 Mich 152, 159; 934 NW2d 665 (2019). We also review de novo questions concerning the interpretation and application of a statute. *Estes v Titus*, 481 Mich 573, 578-579; 751 NW2d 493 (2008).

## C. SUMMARY DISPOSITION PRINCIPLES UNDER MCR 2.116(C)(10)

MCR 2.116(C)(10) provides that summary disposition is appropriate when, "[e]xcept as to the amount of damages, there is no genuine issue as to any material fact, and the moving party is entitled to judgment or partial judgment as a matter of law." A motion brought pursuant to MCR 2.116(C)(10) tests the factual support for a party's action. *Pioneer State Mut Ins Co v Dells*, 301 Mich App 368, 377; 836 NW2d 257 (2013). "Affidavits, depositions, admissions, or other documentary evidence in support of the grounds asserted in the motion are required . . . when judgment is sought based on subrule (C)(10)," MCR 2.116(G)(3)(b), and such evidence, along with the pleadings, must be considered by the court when ruling on the (C)(10) motion, MCR 2.116(G)(5). "When a motion under subrule (C)(10) is made and supported . . ., an adverse party may not rest upon the mere allegations or denials of his or her pleading, but must, by affidavits or as otherwise provided in this rule, set forth specific facts showing that there is a genuine issue for trial." MCR 2.116(G)(4).

"A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the pleadings, affidavits, and other documentary evidence, when viewed in a light most favorable to the nonmovant, show that there is no genuine issue with respect to any material fact." *Pioneer State*, 301 Mich App at 377. "A genuine issue of material fact exists when the record, giving the benefit of reasonable doubt to the opposing party, leaves open an issue upon which reasonable minds might differ." *West v Gen Motors Corp*, 469 Mich 177, 183; 665 NW2d 468 (2003). The trial court is not permitted to assess credibility, weigh the evidence, or resolve factual disputes, and if material evidence conflicts, it is not appropriate to grant a motion for summary disposition under MCR 2.116(C)(10). *Pioneer State*, 301 Mich App at 377. "Like the trial court's inquiry, when an appellate court reviews a motion for summary disposition, it makes all legitimate inferences in favor of the nonmoving party." *Skinner v Square D Co*, 445 Mich 153, 162; 516 NW2d 475 (1994). "[S]peculation is insufficient to create an issue of fact." *MEEMIC Ins Co v DTE Energy Co*, 292 Mich App 278, 282; 807 NW2d 407 (2011). A court may only consider substantively admissible evidence actually proffered by the parties when ruling on the motion. *Maiden v Rozwood*, 461 Mich 109, 121; 597 NW2d 817 (1999); see also MCR 2.116(G)(6).

## D. CASELAW AND MCL 600.2912a(2)

Before the Legislature amended MCL 600.2912a and added the language at issue through enactment of 1993 PA 78, our Supreme Court in *Falcon v Mem Hosp*, 436 Mich 443, 461-462; 462 NW2d 44 (1990), held that a lost opportunity to survive is compensable in a medical

malpractice suit even when the lost opportunity is less than 50%. The Supreme Court observed that "[a] number of courts have recognized, as we would, loss of an opportunity for a more favorable result, as distinguished from the unfavorable result, as compensable in medical malpractice actions" and that "[u]nder this approach, damages are recoverable for the loss of opportunity although the opportunity lost was less than even[.]" *Id.* at 461. In *Falcon*, there was evidence that the deceased patient would have had a 37.5% opportunity of survival had the physician followed proper medical procedures. *Id.* at 447. The Court held that the loss of a "substantial opportunity" to avoid physical harm is actionable. *Id.* at 469. The *Falcon* Court then ruled that it was "persuaded that loss of a 37.5 percent opportunity of living constitutes a loss of a substantial opportunity of avoiding physical harm" and that it "need not now decide what lesser percentage would constitute a substantial loss of opportunity." *Id.* at 470. The Supreme Court therefore held that the defendants were not entitled to summary disposition. *Id.* at 472.

Three years later, subsection (2) of MCL 600.2912a was added by 1993 PA 78, and subsection (2) of the statute provides as follows:

> In an action alleging medical malpractice, the plaintiff has the burden of proving that he or she suffered an injury that more probably than not was proximately caused by the negligence of the defendant or defendants. In an action alleging medical malpractice, the plaintiff cannot recover for loss of an opportunity to survive or an opportunity to achieve a better result unless the opportunity was greater than 50%.[9]

In *Wickens v Oakwood Healthcare Sys*, 242 Mich App 385, 390; 619 NW2d 7 (2000), rev'd in part and vacated in part by 465 Mich 53 (2001), this Court addressed the question whether MCL 600.2912a(2) "allows for recovery when the initial opportunity to survive before the alleged malpractice is greater than fifty percent, as argued by plaintiffs, or, rather, if the statute only allows for recovery when the difference between the opportunity to survive before and after the alleged malpractice is greater than fifty percent, as defendants contend." The *Wickens* panel agreed with the plaintiffs' construction of the statute. *Id.* Accordingly, this Court held that MCL 600.2912a(2) "requires plaintiffs in medical malpractice actions seeking recovery for loss of an opportunity to survive or an opportunity to achieve a better result to show that, had the defendant not been negligent, there was a greater than fifty percent chance of survival or a better result." *Id.* at 392.

*Wickens* involved an alleged failure to timely diagnose cancer, but there was no death. *Id.* at 386. Moreover, on direct review by our Supreme Court, the Court held:

> We hold that a living person may not recover for loss of an opportunity to survive, and that plaintiff's claim is therefore barred to the extent that it is based on such loss of opportunity. We further hold that the trial court nevertheless erred in

---

[9] For ease of reference in this opinion, when I speak of or refer to subsection (2) of MCL 600.2912a, it will pertain solely to the second sentence in subsection (2) unless otherwise indicated.

dismissing plaintiff's case in its entirety, because she has made additional claims that are independent of her claim for loss of an opportunity to survive. Accordingly, we reverse in part and vacate in part the opinion of the Court of Appeals and remand this matter to the trial court for further proceedings consistent with this opinion. [*Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 54-55; 631 NW2d 686 (2001).[10]]

In *Dykes v William Beaumont Hosp*, 246 Mich App 471, 477; 633 NW2d 440 (2001), this Court, being bound, applied the construction of MCL 600.2912a(2) that the *Wickens* panel had enunciated; the Supreme Court had not yet reversed and vacated this Court's ruling in *Wickens*.

In 2002, this Court, not feeling constrained or bound by the Court of Appeals' decision in *Wickens*, issued its opinion in *Fulton*, 253 Mich App 70.[11] The *Fulton* panel rejected *Wickens*'s interpretation of MCL 600.2912a(2) and instead held that MCL 600.2912a(2) "requires a plaintiff to show that the loss of the opportunity to survive or achieve a better result exceeds fifty percent." *Fulton*, 253 Mich App at 83. In *Fulton*, the patient died of cervical cancer, and a medical expert opined that observations by the patient's OB-GYN should have led her to suspect that the patient may have been in the early stages of cervical cancer. *Id.* at 72-73. The complaint alleged a failure to properly diagnose and treat the decedent, resulting in a loss of the opportunity to survive. *Id.* at 73. Applying its construction of MCL 600.2912a(2) to the facts presented, the Court in *Fulton* ruled:

> In this case, plaintiff's expert stated that Fulton's initial opportunity to survive was eighty-five percent and that her opportunity to survive after the alleged malpractice was sixty to sixty-five percent. Therefore, because her loss of opportunity due to defendants' alleged malpractice was not greater than fifty percent, we hold that the trial court erred in denying defendants' motion for summary disposition. [*Id.* at 84.]

The *Fulton* panel found that the decedent "suffered a loss of a twenty to twenty-five percent chance of survival." *Id.* at 82. Thus, this Court made a calculation of the lost opportunity to survive on

---

[10] The *Wickens* Court elaborated:

> [A] loss of an opportunity to survive claim only encompasses injuries already suffered, which clearly limits recovery to situations where death has already occurred. Because the evidence concerning the reduction in her chances of survival over a ten-year period is relevant only to her potential, future death, the living plaintiff in this case may not recover for this "loss of opportunity." [*Wickens*, 465 Mich at 61.]

[11] In *Fulton*, 253 Mich App at 79, this Court stated that it was not mandated to follow *Wickens* "under principles of stare decisis because a majority of the Supreme Court vacated that portion of this Court's opinion regarding the interpretation of the second sentence of MCL 600.2912a(2) and did not express approval or disapproval of this Court's reasoning on the issue."

-13-

the basis of simple subtraction—subtracting the post-malpractice chance of survival from the pre-malpractice chance of survival.

*Fulton* requires a percentage-point measurement of the reduction or diminishment in the opportunity to survive, thereby necessitating an assessment of the opportunity to survive absent the alleged malpractice and an assessment of the opportunity to survive in light of the purported malpractice. Stated another way, a court must evaluate a patient's opportunity to survive had there been non-negligent or proper treatment and then also evaluate the patient's opportunity to survive after having been subjected to negligent care or treatment. Whereas the rejected interpretation of MCL 600.2912a(2) by the *Wickens* panel entailed simply determining, using a percentage, the initial opportunity to survive had there been no malpractice or had there been proper treatment.

In *Ensink v Mecosta Co Gen Hosp*, 262 Mich App 518, 527-539; 687 NW2d 143 (2004), this Court again addressed the proper construction of MCL 600.2912a(2), concluding that it was bound by the interpretation in *Fulton*, while at the same time requesting the convening of a special conflict panel under MCR 7.215(J)(2) because it agreed with the construction of the statute set forth by this Court in *Wickens*. In *Ensink*, the plaintiff patient suffered a stroke and claimed that it resulted in paralysis because the defendants failed to administer tissue plasminogen activator (t-PA) within the necessary three-hour window. *Id.* at 521. Upon polling of the judges of this Court, MCR 7.215(J)(3), they were evenly divided on the issue regarding the proper interpretation of MCL 600.2912a(2); consequently, a special panel was not convened, and *Fulton* remained controlling law. *Ensink v Mecosta Co Gen Hosp*, 264 Mich App 801 (2004).

In *Klein v Kik*, 264 Mich App 682, 685-686; 692 NW2d 854 (2005), this Court applied *Fulton*'s construction of MCL 600.2912a(2) because it was bound by the interpretation. In *Klein*, the Court addressed an alleged misdiagnosis of and delay in discovering a rare form of lung cancer, which ultimately resulted in a patient's death. *Id.* at 683-684. The Court ruled that the action failed as a matter of law because there was a 75% chance of survival under the best of circumstances and a 30% chance of survival in light of the alleged malpractice, resulting in a percentage-point-differential of only 45%. *Id.* at 687-688.

In 2008, our Supreme Court in *Stone v Williamson*, 482 Mich 144, 147-148; 753 NW2d 106 (2008), addressed a case in which the "[p]laintiff suffered the rupture of an abdominal aortic aneurysm that had gone undetected despite physical examinations and testing by a number of physicians[,]" resulting in a "medical-malpractice suit against [a] radiologist and two vicariously liable entities on the theory that a negligent diagnosis resulted in the rupture and all resulting harm."[12] The case produced a plethora of views and opinions by the justices of the Michigan Supreme Court regarding MCL 600.2912a(2) and *Fulton*, prompting Chief Justice TAYLOR, in the lead opinion, to summarize the positions:

> In an attempt to clarify for the reader the majority and minority positions on each issue, I provide the following summary:

---

[12] The plaintiff survived the ruptured aneurysm. *Stone*, 482 Mich at 148.

-14-

All seven justices would affirm the result of the Court of Appeals decision and the judgment for plaintiff. Six of the justices believe that this is not a lost-opportunity case; Justice Markman would hold that it is such a case. All seven justices believe that *Fulton*'s analysis is incorrect or should be found to no longer be good law, though their reasons for doing so vary. Justices Corrigan and Young and I would find that *Fulton* is no longer good law because we would hold that the statute is unenforceable as written.[13] Justice Markman would hold that *Fulton* is inconsistent with the statutory language. Justices Weaver, Cavanagh, and Kelly would hold that *Fulton* is incorrect because it erroneously added words to the statute when analyzing the phrase "the opportunity." Of the four justices holding that the statute is not unenforceable as written (Justices Weaver, Cavanagh, Kelly, and Markman), only Justice Markman would define the term "opportunity" in accordance with the Waddell article,[14] while the other three (Justices Weaver, Cavanagh, and Kelly) would define it in accordance with *Falcon*, but with a higher

---

[13] With respect to the conclusion that the second sentence in MCL 600.2912a(2) was unenforceable, the Chief Justice wrote:

As written, the second sentence of MCL 600.2912a(2) can be made understandable only by adding words or by redefining "injury" in a way significantly contrary to the mass of caselaw at the time the sentence was added. Another possible alternative reading is that the second sentence of subsection 2 was intended not to create a new type of claim, but to limit courts from expanding the common law so far as to allow cases like *Falcon*. None of these multiple, contradictory interpretations can be shown to be the "correct" construction of legislative intent. Choosing between them can only be a guess. Moreover, it remains that the second sentence impossibly conflicts with the requirement of a proximate cause of the injury in both the first sentence of subsection 2 and in subsection 1. Accordingly, I conclude that the second sentence of subsection 2 cannot be judicially enforced because doing so requires the Court to impose its own prerogative on an act of the Legislature. [*Stone*, 482 Mich at 160-161.]

.

[14] Justice MARKMAN observed:

*Fulton* did not offer any explanation as to why it merely subtracted the postmalpractice chance from the premalpractice chance to determine the "lost opportunity." This might have been the correct method of determining the "lost opportunity" if MCL 600.2912a(2) required that such a loss be "greater than 50 percentage points." However, MCL 600.2912a(2) requires that the "lost opportunity" be "greater than 50%." There is a significant distinction between 50 percentage points and 50 percent. As Dr. Roy Waddell, a board-certified orthopedic surgeon in Grand Rapids, has explained: "A decrease in survival rate from 50 percent to 10 percent is a 40–percentage–point decrease, but it is an 80 percent decrease." [*Stone*, 482 Mich at 196 (citation omitted).]

threshold than *Falcon* required. The same four justices (Justices Weaver, Cavanagh, Kelly, and Markman) would hold that loss of the opportunity is, by itself, a compensable injury, although the opportunity must be "lost"—that is, the bad result must occur—in order for a claim to accrue.

Given this montage of issues and positions created by the language of this statute, it would be helpful for the Legislature to reexamine its goal and the policies it wishes to promote and strive to better articulate its intent in that regard. [*Stone*, 482 Mich at 164.]

Subsequently, in *Lanigan v Huron Valley Hosp, Inc*, 282 Mich App 558, 562; 766 NW2d 896 (2009), the plaintiff patient alleged that the "defendants failed to timely diagnose [a] heart attack, timely order thrombolytic therapy, and timely transfer [the patient] to a facility capable of emergency cardiac intervention[.]" The plaintiff alleged that the defendants' conduct breached the medical standard of care, causing the plaintiff to "lose an opportunity for a better result, i.e., receiving a cardiac bypass and a longer life expectancy as opposed to a heart transplant and a shorter life expectancy[.]" *Id.* Weeding through *Stone* in an effort to make sense of its impact, the *Lanigan* panel ruled:

Because the majority of the justices determined that the plaintiff's claim in *Stone* was not a lost-opportunity claim, but an ordinary medical malpractice claim, the issue of the correctness of *Fulton* was not properly before the Court. Accordingly, because the correctness of *Fulton* was not properly before the Court and because *Stone* is a plurality opinion, *Stone* is not binding on this Court and it does not establish a point of law. Therefore, the prevailing analysis for lost-opportunity cases remains that set forth in *Fulton*, and regardless of whether we think *Fulton* was properly decided we are bound to follow it. [*Lanigan*, 282 Mich App at 567 (citations omitted).]

One year later, in *Edry v Adelman*, 486 Mich 634, 636; 786 NW2d 567 (2010), the plaintiff patient alleged that her physician failed to test a lump on the plaintiff's arm for cancer and that a subsequent biopsy revealed an invasive cancer that had spread to 16 lymph nodes, resulting in a radical mastectomy, multiple rounds of chemotherapy, and radiation therapy. The Michigan Supreme Court, in a memorandum opinion, held:

First, plaintiff cannot pursue a claim based solely on her decreased odds of survival because that alone does not create a basis for relief under MCL 600.2912a(2). Defendant's expert did testify that the delay decreased plaintiff's odds of surviving five years, but he did not testify that any present injury arose from that reduction in her survival chance. This Court has held that a reduced chance of survival alone is not a cognizable injury under MCL 600.2912a(2). See *Wickens* . . . . . Defendant's expert merely testified that the delay reduced plaintiff's odds of surviving five years, which is not a present injury as required by MCL 600.2912a(2). Because defendant's expert did not testify as to any other harm that could be considered a present injury, plaintiff cannot support her claim with defendant's expert's testimony. [*Edry*, 486 Mich at 642-643.]

In *O'Neal*, 487 Mich at 490-491, the plaintiff suffered a disabling stroke that was allegedly caused by the defendants' failure to perform a timely blood transfusion. In the lead opinion, Justice HATHAWAY stated:

We hold that the Court of Appeals erred by relying on *Fulton* and determining that this is a loss-of-opportunity case controlled by both the first and second sentences of MCL 600.2912a(2), and instead hold that this case presents a claim for traditional medical malpractice controlled only by the first sentence of § 2912a(2). Further, we conclude that plaintiff established a question of fact on the issue of proximate causation because plaintiff's experts opined that defendants' negligence more probably than not was the proximate cause of plaintiff's injuries. Finally, we hold that *Fulton* did not correctly set forth the burden of proof necessary to establish proximate causation for traditional medical malpractice cases as set forth in § 2912a(2). Therefore, we overrule *Fulton* to the extent that it has led courts to improperly designate what should be traditional medical malpractice claims as loss-of-opportunity claims and has improperly transformed the burden of proof in a traditional malpractice case from a proximate cause to the proximate cause. [*O'Neal*, 487 Mich at 489-490.]

Justice WEAVER fully concurred with Justice HATHAWAY. *Id.* at 507. Justice CAVANAGH, joined by Chief Justice KELLY, wrote:

I concur in the result. I agree with the majority that the Court of Appeals' judgment in this case should be reversed because the Court erred by treating this case as a loss-of-opportunity case instead of a traditional medical malpractice case and, as a result, erred by requiring plaintiff to meet the requirements in the second sentence of MCL 600.2912a(2). I further agree that *Fulton* . . . should be overruled to the extent that courts have relied on it to improperly transform what could be traditional medical malpractice claims into loss-of-opportunity claims. I write separately to express my views on the issues presented. [*O'Neal*, 487 Mich at 507-508.]

In the lead opinion, Justice HATHAWAY addressed the particular formula employed by this Court in *Fulton*:

*Fulton* opined that because the decedent went from an 85 percent pre-malpractice chance of survival to a 60-65 percent post-malpractice chance of survival, she suffered a loss of a twenty to twenty-five percent chance of survival. *Fulton* determined that a percentage point differential subtraction analysis was required by the statute. As demonstrated by the *Fulton* analysis, the conclusion is reached by a simplistic subtraction formula. *Fulton* subtracted the statistical likelihood of a better outcome without treatment from the statistical likelihood of a better outcome with treatment to determine if the resulting number is greater than 50.

*Fulton*'s simplistic subtraction formula is not an accurate way to determine whether a defendant's malpractice is a proximate cause of the injury. Fulton's

-17-

analysis was erroneous because it misconstrued proximate causation *as it applies to a traditional malpractice case*. [*Id.* at 499 (quotation marks omitted; emphasis added).]

She later reiterated that "[g]iven that *Fulton* used an incorrect mathematical formula and is being used to transform the burden of proof in traditional malpractice cases," it has no continuing validity "in the context of traditional medical malpractice cases." *Id.* at 505. I construe Justice HATHAWAY's ruling as simply a determination that *Fulton*'s percentage-point-differential computation is inapplicable in a standard medical malpractice action; the reasoning or analysis did not suggest that *Fulton*'s percentage-point-differential formula is inapplicable in a true lost-opportunity action. Indeed, her lead opinion "emphasize[d] that we hold that the second sentence of § 2912a(2) applies only to medical malpractice cases that plead loss of opportunity and not to those that plead traditional medical malpractice; we do not address the scope, extent, or nature of loss-of-opportunity claims as that issue is not before us." *Id.* at 506. Justice HATHAWAY noted that "[s]ignificant questions surround such claims." *Id.*

In Justice CAVANAGH's concurrence in *O'Neal*, he indicated that with respect to causation in a standard medical malpractice case, he "reject[ed] the view that a plaintiff must show that the defendant's negligence increased the plaintiff's risk by more than 50 percentage points, e.g., from 25 percent to 76 percent, or from 10 percent to 61 percent." *Id.* at 511. Justice CAVANAGH added, "To the extent that I endorsed the percentage point approach by way of an example in my opinion in *Stone*, I repudiate that position." *Id.* at 511 n 7. As with Justice HATHAWAY's position, I do not view Justice CAVANAGH's stance as rejecting the analysis in *Fulton* relative to a true lost-opportunity suit.

Prompted by the statements referenced above in the lead and concurring opinions in *O'Neal*, Justice MARKMAN, concurring in result only, concluded that the case was a lost-opportunity action, and he then stated:

> I observed in *Stone*, the first problem with *Fulton* is that it requires a loss of more than 50 percentage points, while MCL 600.2912a(2) requires a loss of more than 50 percent.
>
> * * *
>
> I am pleased that Justice CAVANAGH and the other justices who signed his opinion in *Stone* (Chief Justice KELLY and Justice WEAVER) now apparently recognize this analytical error, and that they now "repudiate" that position. Thus, a majority of the justices of this Court now agree that MCL 600.2912a(2) requires us to determine whether the lost opportunity is "greater than 50%," not whether the lost opportunity is greater than 50 percentage points. [*O'Neal*, 487 Mich at 518-519.]

Despite Justice MARKMAN's comments, I do not believe that a majority of justices in *O'Neal* reached the issue whether the percentage-point-differential formula employed by the *Fulton* panel applies in a case in which a plaintiff presents a genuine loss-of-opportunity claim. Again, a majority of justices appeared to merely conclude that the *Fulton* analysis cannot be

-18-

applied in a traditional medical malpractice action because it conflicts with the proper manner to establish causation. *Stone* and *O'Neal* do not present pictures of clarity. The proper construction of the lost-opportunity provision in MCL 600.2912a(2) begs clear resolution by our Supreme Court, and I implore the Court to take up the matter when the chance arises.

### E. DISCUSSION AND MY PROFFERED RESOLUTION

### 1. LOSS-OF-OPPORTUNITY ACTION VERSUS TRADITIONAL MEDICAL MALPRACTICE ACTION

The caselaw requires a determination whether a claim constitutes a classic medical malpractice claim, solely implicating the first sentence of MCL 600.2912a(2), or whether it amounts to a loss-of-opportunity claim, implicating the second sentence of subsection (2). As reflected by the cases reviewed above, this is not an easy question to resolve. The lost-opportunity doctrine is potentially available in circumstances where a plaintiff cannot prove that a defendant's actions were the cause of alleged physical injuries but can establish that the defendant's actions deprived him or her of a chance to avoid those injuries. *Stone*, 482 Mich at 152 (opinion by TAYLOR, C.J.); *Ykimoff v W A Foote Mem Hosp*, 285 Mich App 80, 99-100; 776 NW2d 114 (2009).

In *Taylor v Kent Radiology*, 286 Mich App 490, 498; 780 NW2d 900 (2009), the plaintiffs sued a radiologist for failing to diagnose a talus fracture when interpreting the plaintiff patient's x-rays, which failure allegedly resulted in an otherwise unnecessary surgery, avascular necrosis, and arthritis. The *Taylor* panel rejected the defendants' argument that the plaintiffs' action implicated the second sentence in MCL 600.2912a(2) and the lost-opportunity doctrine, concluding that upon examination of the plaintiffs' complaint, trial brief, and statements at trial, it was clear that plaintiffs framed their action as a traditional medical malpractice suit. *Id.* at 509. This Court observed that whether the second sentence of MCL 600.2912a(2) applies in a given case is dependent on the nature of the claims brought by the plaintiff. *Id.* at 506.

In *Velez v Tuma*, 283 Mich App 396, 397; 770 NW2d 89 (2009), rev'd in part on other grounds by 492 Mich 1 (2012), the lawsuit arose from the "defendant's alleged failure to timely and properly diagnose and treat the acute vascular insufficiency condition that plaintiff presented with on February 1, 2000, which resulted her left leg being amputated below the knee on February 13, 2000." The defendant argued, in part, that he was entitled to a judgment notwithstanding the verdict because the plaintiff had failed to establish proximate cause under the lost-opportunity language in MCL 600.2912a(2). *Id.* at 398. This Court rejected the argument, ruling:

> The claimed injury here is a physical injury—the loss of plaintiff's leg below the knee. This was not a case in which plaintiff was claiming a loss of opportunity of any kind; she claimed that defendant's negligence more probably than not directly caused her to lose her leg below the knee. In other words, this is a traditional case of malpractice. [*Id.* at 403.]

Contrary to the majority's holding, I first conclude that plaintiff did in fact pursue a genuine lost-opportunity action under MCL 600.2912a(2). A review of plaintiff's complaint clearly shows that this suit was pled as a loss-of-opportunity case. Plaintiff did not allege that Dr. Alsawah's negligence caused Patricia's death, nor do I believe that plaintiff could prove that Patricia's death

-19-

was more probably than not proximately caused by Dr. Alsawah's negligence. Rather, as reflected in the allegations contained in the complaint, plaintiff contended that Dr. Alsawah's breach of the standard of care caused a "delay in the diagnosis of Patricia Benigni's metastatic disease," that the delay resulted in the advancement of the disease in the liver and adrenal glands, and "[t]hat an earlier diagnosis of the disease would have given Patricia . . . *a better prognosis, including increased survival* or cure." (Emphasis added.) The language and gravamen of the complaint was thus focused on an alleged compensable injury that was in the form of a lost opportunity to survive, not the death itself.

Furthermore, in response to defendants' motion for summary disposition, plaintiff, in his response brief and at oral argument, specifically indicated that his lawsuit was based on Patricia's lost opportunity to survive and that the parties were in agreement regarding the applicability of the lost-opportunity provision found in MCL 600.2912a(2). And the trial court analyzed the case as a loss-of-opportunity action because that is how it was presented to the court. Additionally, plaintiff does not argue on appeal that the case should be treated as a traditional medical malpractice action. Indeed, at oral argument in this Court, plaintiff's counsel, on questioning by the panel, adamantly insisted that plaintiff's theory of recovery is based on a lost opportunity to survive pursuant to MCL 600.2912a(2). Accordingly, even if the majority were correct that this case constituted a conventional medical malpractice suit, defendants would be entitled to summary dismissal of the action because plaintiff effectively waived any claim or argument that he was pursuing a traditional medical malpractice lawsuit. See *Progress Mich v Attorney General*, 506 Mich 74, 93; 954 NW2d 475 (2020) (waiver involves the intentional relinquishment of a known right).

The majority is correct that *Fulton* has similarities to the instant action: they are both medical malpractice suits with core allegations of a failure to timely diagnose a medical condition. But at the same time, *Wickens*, 465 Mich 53, *Klein*, 264 Mich App 682, and *Lanigan*, 282 Mich App 558, were treated as loss-of-opportunity suits, even though the core allegations also concerned the failure to timely diagnosis a medical condition. This is exactly why our Supreme Court needs to provide some clarity regarding what exactly constitutes a lost-opportunity lawsuit under MCL 600.2912a(2).

2. LOSS OF AN OPPORTUNITY TO SURVIVE THAT IS GREATER THAN 50 PERCENT

I initially find it necessary to elaborate on the parties' and the trial court's treatment of *Fulton*. With respect to defendants' motion for summary disposition, they argued that plaintiff's action failed as a matter of law under *Fulton* and application of the percentage-point-differential formula. Defendants maintained that *Fulton* remained good law in the context of a loss-of-opportunity action even after *Stone* and *O'Neal*. Defendants' position on appeal is consistent with their argument below.

In response to the motion for summary disposition, plaintiff agreed that *Fulton* was controlling in comparison to or when judged against this Court's decision in *Wickens*. Stated otherwise, plaintiff agreed with the analysis in *Fulton* that the chance of survival pre-malpractice and the chance of survival post-malpractice had to both be evaluated when assessing whether there existed a lost opportunity to survive that was greater than 50%, as opposed to simply evaluating the chance of survival pre-malpractice as held by the *Wickens* panel. Plaintiff, however, did not agree with *Fulton*'s percentage-point-differential construction of MCL 600.2912a(2), contending

that the pure percentage approach embraced by Justice MARKMAN in *Stone* and *O'Neal* constituted the proper interpretation of the statute. Plaintiff was of the view that *O'Neal* effectively discarded the percentage-point-differential formula utilized in *Fulton*. Plaintiff's position on appeal is consistent with his position below. Although plaintiff does not engage in any type of mathematical computation or calculation, he plainly concludes that there was a 50% decrease in Patricia's opportunity to survive, even assuming that her chance of survival did not diminish by 50 *percentage* points. The trial court stated that it was applying *Fulton*, but the court never expressly spoke in terms of the percentage-point-differential formula. The fundamental aspect of the trial court's ruling was that the status of Patricia's cancer in November 2015 was too unknown and speculative to make any finding of her chances to survive at that time.

I have now concluded that *Fulton* remains controlling law even after *O'Neal* was issued, including *Fulton*'s percentage-point-differential formula, but *Fulton* is good law only in the context of a loss-of-opportunity action. I note that even if *Fulton* is disregarded, the binding decision in *Lanigan*, 282 Mich App at 567, applied the *Fulton* analysis with respect to a lost-opportunity lawsuit, which type of suit *O'Neal* did not address. While plaintiff argues that *Fulton* should be revisited by this Court and that the percentage-point-differential formula is contrary to the plain language of MCL 600.2912a(2), I conclude that any change in the interpretation of the loss-of-opportunity provision, at this stage of the caselaw history and development, must come from our Supreme Court. I now proceed with my analysis under *Fulton*.

Defendants' position with respect to summary disposition essentially operated on the *assumption* that Dr. Alsawah was negligent by not ordering additional testing in November 2015 and that Patricia indeed had metastatic colorectal cancer involving her liver and possibly her adrenal glands at that time. I understand that these were assumptions for purposes of summary disposition and that defendants were not conceding that malpractice occurred or that the cancer was present in Patricia's liver or adrenal glands in November 2015. At its core, defendants' argument was that assuming those points, there was no genuine issue of material fact that Patricia's opportunity to survive in November 2015 was not greater than 50%, nor was her opportunity to survive in 2015 more than 50 percentage points greater than her opportunity to survive in 2017 when the cancer diagnosis was actually made.

I would hold that under this Court's opinion in *Fulton* with respect to the interpretation of MCL 600.2912a(2), the trial court did not err in granting summary disposition to defendants. Viewing the evidence in a light most favorable to plaintiff, I start from the position that Patricia's opportunity to survive in 2017 when she was diagnosed with metastatic colorectal cancer was essentially zero or negligible. The surgeon who saw Patricia after the 2017 diagnosis had opined that a resection was "technically feasible," but he seriously questioned whether Patricia could recover from the surgical procedure, and that was without taking into account the possibility that the cancer had spread to one or both of her adrenal glands. More importantly, defense counsel asked Dr. Gordon about the statistical likelihood of survival under the circumstances facing Patricia in 2017 when the metastasis was discovered, and Dr. Gordon responded:

> Again, it depends upon exactly what is the presentation, but someone who is presenting with a large mass in the liver with multiple other masses in the liver, what looks to have both adrenal glands involved, and a performance status that is not good, the survival would have been considered less than a year.

When asked whether he meant that almost 100% of patients in such circumstances would not survive, Dr. Gordon answered:

> If they have a big large mass in the liver, multiple other masses in the liver, and disease in the adrenal gland and their medical condition is poor, they tend not to [survive] because they don't tend to get treatment or tolerate treatment.

Again, viewed in a light most favorable to plaintiff, this evidence could lead a reasonable juror to conclude that Patricia had no chance of survival upon diagnosis in 2017. Consequently, under *Fulton*'s percentage-point-differential formula, plaintiff was required to submit documentary evidence quantifying or otherwise showing that Patricia's opportunity to survive in November 2015 was greater than 50%. Such evidence would demonstrate a loss of the opportunity to survive that exceeded 50 percentage points. Dr. Gordon's deposition testimony revealed his opinion that absent the alleged malpractice, there was a missed opportunity to take curative-intent measures, such as surgery, or to look into other types of treatment to extend survival. But simply providing evidence that Patricia would have had a chance to survive had the metastasized cancer been discovered in 2015 instead of 2017 did not suffice to create a jury-triable issue under MCL 600.2912a(2). Because of all of the unknown variables at play, Dr. Gordon simply could not "give a specific number" in regard to a percentage-based opportunity for survival in November 2015. A jury would have to engage in pure speculation in determining whether Patricia's lost opportunity to survive in 2015 was greater than 50%.

In Dr. Gordon's summary-disposition affidavit, he averred that detection of the cancer in 2015 would have resulted in "a better diagnosis," "in a much more favorable category for a successful treatment outcome" or "for long-term survival," in "a higher rate of curative treatment," in a "more likely . . . option for curative-intent surgery," and in "an opportunity to achieve a better result." These vague claims are effectively no different from Dr. Gordon's assertions in his deposition—there is no specificity or quantification as necessary to conduct an analysis and make a finding under this Court's decision in *Fulton*. Each of Dr. Gordon's opinions would be accurate whether Patricia's opportunity for survival was 10% or 51% in 2015, absent any ability for a juror, *on the basis of evidence*, to settle upon a final figure.

Plaintiff argues that under *Lanigan*, 282 Mich App 558, a party is not required to supply numerical or quantitative statistical data to satisfy the *Fulton* standard; rather, nonnumerical or nonquantitative testimony can provide the necessary information compelled by *Fulton*. In *Lanigan*, this Court noted that a doctor's "nonquantitative statements convey[ed] a greater than 50 percent chance of a better result" when the doctor expressed that the plaintiff would have suffered little or no functional deficit had she received bypass surgery rather than a heart transplant. *Lanigan*, 282 Mich App at 568. The Court observed that the doctor's statements were tantamount to describing a nearly 100% better result. *Id.* In this case, Dr. Gordon did not provide any testimony or averments that even came close to the definitive statements made by the doctor in *Lanigan.* If Dr. Gordon had indicated that Patricia would have been a good candidate for surgery in 2015 and in all likelihood would have survived the metastasized colorectal cancer, I would agree that it would qualify as evidence that Patricia had a greater than 50% opportunity for survival in 2015. But no such evidence was presented.

Plaintiff argues that the connotation arising from Dr. Gordon's use of phrases such as "more likely," "higher rate," or "more favorable" is that there was a greater than 50% chance that Patricia would have survived had the metastasis been discovered in 2015. Minimally, according to plaintiff, reasonable jurors could disagree on the matter. First, Dr. Gordon unequivocally testified that he could not "give a specific number" in regard to the statistical opportunity for Patricia to survive. Moreover, as I noted earlier, Dr. Gordon's averments can potentially convey a view that Patricia's opportunity to survive was below or above the threshold when considered in relationship to the evidence that Patricia essentially had no chance for survival when diagnosed in 2017. And, again, jurors would have to speculate in reaching or finding a numerical percentage because there would be no evidence to guide them in selecting from the range.

In the affidavit, Dr. Gordon also stated that the "literature indicates, in surgical case series, five-year overall survival rates following surgical resection of metastatic colorectal cancer to the liver range from 24 to 58 percent." I first note that this averment can be construed as being contrary to Dr. Gordon's deposition testimony, in which he refused to provide any numerical survivor rates and emphasized that it was not possible to place a specific percentage on Patricia's chance of survival in 2015 because there were too many unknown variables. See *Downer v Detroit Receiving Hosp*, 191 Mich App 232, 234; 477 NW2d 146 (1991) ("Parties may not create factual issues by merely asserting the contrary in an affidavit after giving damaging testimony in a deposition."). Additionally, the article from which Dr. Gordon obtained the statistics was last updated with new evidence on November 5, 2020; consequently, its relevancy to liver resections in 2015 is unknown.

Furthermore, the statistics revealing a five-year, survival-rate range of 24 to 58 percent pertained to cancer patients who underwent resections. As quoted earlier, the UpToDate article showing the statistical range stated that "[i]t is safe to say that a majority of patients with metastatic disease are not potentially curative surgical candidates because of tumor size, location, multifocality, or inadequate hepatic reserve." And Dr. Gordon could only say that Patricia's option for surgery in 2015 was better or more feasible than in 2017, but, again, there were too many unknown variables to definitively find that Patricia would have been a candidate for a resection in 2015. Also, even with respect to patients who underwent a resection, the UpToDate article indicated that the average five-year-survival rate was 40%, which would fail to meet the percentage needed by plaintiff to succeed on the lost-opportunity claim.[15] Finally, I find telling that Dr. Gordon, while referencing the five-year-survival statistics that ranged from 24 to 58 percent, did not specifically aver that Patricia's particular circumstances gave reason to categorize or view her like the group of patients who had a five-year survival rate of over 50%, as opposed to a lower rate that would not suffice to save plaintiff's suit. Jury speculation would absolutely be necessary for plaintiff to satisfy the percentage-point-differential standard set forth by this Court in *Fulton*.

---

[15] MCL 600.2912a(2), while addressing the loss of an opportunity to survive, provides no parameters regarding the prospective length of time of survival that should be measured; the opportunity to survive one year can differ from the opportunity to survive five years. The parties do not delve into this subject, and I thus decline to do so. I note that the record showed that a five-year survival rate is a common benchmark used in cancer research and treatment.

In sum, I would hold that plaintiff's suit is ultimately too speculative and that there is no genuine issue of material fact that Patricia's lost opportunity to survive was not greater than 50% under *Fulton*'s construction of MCL 600.2912a(2). Additionally, I disagree with the majority that this case is not a lost-opportunity suit. Moreover, plaintiff has waived any right to pursue this case as a traditional medical malpractice action. Accordingly, I conclude that the trial court did not err by granting summary disposition in favor of defendants and therefore dissent.

/s/ Jane E. Markey